LONG ET AL., APPELLANTS, *v.* ISAKOV ET AL., APPELLEES.

(No. 55411—Decided
June 26, 1989.)

*Sindell, Lowe & Guidubaldi Co.,
L.P.A., David J. Guidubaldi* and
*Claudia R. Eklund,* for appellants.
*Jacobson, Maynard, Tuschman &
Kalur Co., L.P.A., Jerome S. Kalur,
Robert C. Maynard, Janis L. Small;*
*Gary Goldwasser; Kitchen, Messner &
Deery* and *Steve Albert,* for appellees.

KRUPANSKY, J. Plaintiffs Rufus and Michele Long ("mother"), individually, and Allyssa Long ("infant"), through her mother Michele Long, filed a complaint in Cuyahoga County Common Pleas Court, case number 85211, against defendants Terrence Isakov, M.D., Family Physicians Associates, Inc., John Cole, Jr., M.D., and Hillcrest Hospital. Plaintiffs' complaint alleged defendants committed medical malpractice and negligence during the labor of Michele Long and the birth of Allyssa Long. As a result of defendants' negligence and malpractice, plaintiffs alleged, Allyssa Long suffered serious and permanent brain damage.

The parties waived medical malpractice arbitration. Plaintiff Rufus Long voluntarily dismissed his claims against all defendants on October 26, 1987. After trial, the jury returned a verdict for defendants. On November 12, 1987 the trial court entered judgment for defendants. Plaintiffs filed a motion for new trial. On March 3, 1988 the trial court overruled plaintiffs' motion for new trial. Plaintiffs filed a timely notice of appeal assigning two errors.

The relevant facts follow:

The mother's expected delivery date of the infant was December 22, 1985. On January 2, 1986 at 3:30 a.m., the mother experienced labor pains and was taken to Hillcrest Hospital. The mother's amniotic membranes were ruptured by Dr. Cole to expedite the infant's delivery process. Dr. Cole was a house physician at Hillcrest Obstetrics Department. Dr. Cole observed an unusually small amount of amniotic fluid exit from the mother.[1]

---

[1] Amniotic fluid is contained in the amniotic sac, the innermost of the membranes enveloping the fetus in utero, and protects the fetus from mechanical injury.

The amniotic fluid was stained with meconium. Meconium is material accumulated in the gastrointestinal tract of the fetus during the growth process, is green in color and is usually confined to the fetal intestines. However, meconium may be excreted during intrauterine stress by the fetus. The mother's labor progressed uneventfully with no indications of fetal distress.

Defendant Dr. Isakov was the mother's private physician. At 7:30 p.m., the mother was placed in the delivery room. Dr. Isakov made two unsuccessful attempts to deliver the infant with forceps between approximately 7:50 p.m. and 8:15 p.m. Dr. Isakov then summoned Dr. Cole, who also made two unsuccessful forceps attempts. During the forceps attempts, the infant experienced bradycardia, a drop in the fetal heart rate. The mother was placed on her side and the fetal heart rate increased until normal.

Dr. Isakov decided the infant's head was too large to permit her to be delivered vaginally and called Dr. Sheldon Gillinov to perform a Caesarean section. The infant was delivered by Caesarean section at 9:15 p.m., approximately one hour and twenty-five minutes after the first forceps attempt had been performed. When Dr. Gillinov entered the uterine cavity, he noted a large amount of thick gobular meconium. Dr. Gillinov also noted the mother did not have any free amniotic fluid. Usually when a Caesarean section is done after attempted vaginal birth, the head of the baby acts as a cork in the birth canal and traps a large amount of amniotic fluid in the uterus. The infant was born with thick meconium in her nose, mouth and lungs. A neonatalogist removed the meconium and ventilated the infant. Dr. Gillinov also noted there was no visible forceps damage to the child or to the mother's uterine wall.

The infant was very large and was born with signs of being post-mature, viz., dry, wrinkled skin and a lack of amniotic fluid.

The infant later experienced seizures. A diagnosis of brain damage was made, caused by asphyxia, a lack of oxygen. The infant has mental and motor damage and an I.Q. of less than 50.

Plaintiffs' theory of the cause of the infant's brain damage was stated by plaintiffs' expert witness, Dr. Rosen, as followed:

"I believe the damage to this child occurred at the end of labor and during the early period after birth."

Defendant Isakov admitted negligence in attempting to deliver the infant with forceps but denied his negligence was the proximate cause of the infant's brain damage. Defendant Isakov contended the application of the forceps did not cause the infant's injuries. Rather, defendant Isakov's theory contended the infant suffered from lack of oxygen in her blood hours or days before defendant Isakov's failed forceps delivery. The lack of oxygen in the infant's blood occurred because the infant was post-mature.

Both sides agree the disputed issue is one of proximate cause. Specifically, the issue is what caused the infant's brain damage and when did the brain damage occur.

Plaintiffs' expert, Dr. Rosen, testified the application of forceps caused the infant's trauma and she excreted meconium which was then aspirated by the infant causing asphyxia, a lack of oxygen. However, on cross-examination, Dr. Rosen admitted the infant was born with meconium stained nails. He further admitted on cross-examination that in his deposition he probably agreed it takes a period of four to six hours of exposure to meconium before meconium stains the nails of an infant. Dr. Rosen

further testified the mother's placenta was deeply stained with meconium, and the depth of the penetration of the meconium into the placental tissue indicates how much time the placenta was exposed to meconium. Dr. Rosen did not view the slides made by Dr. Laipply, the pathologist.

Defendant Isakov's expert Dr. Rorke maintained throughout the proceedings the infant's brain damage was totally inconsistent with a forceps injury. Instead, Dr. Rorke testified the infant's injuries were consistent with hypoxic ischemic injury, which means a lower concentration of oxygen in the blood and a decreased blood flow. Prior to trial, Dr. Rorke was unable to form an opinion as to what caused the infant's hypoxic ischemic injury. However, at trial, Dr. Laipply, a pathologist who examined the mother's placenta, and plaintiffs' expert, Dr. Rosen, testified it would require an in utero meconium exposure of several hours or days prior to the infant's birth to deeply stain the mother's placenta. On the basis of this additional information, Dr. Rorke, Dr. Isakov's expert, testified the hypoxic ischemic injury was caused by some kind of placental insufficiency or decrease in circulation to the infant's brain hours or days before she was born. Dr. Rorke further stated the hypoxic ischemic injury would also affect the infant's kidneys, which would explain the unusually low amount of amniotic fluid.

Plaintiffs' assignments of error follow:

"The trial court erred by not excluding the testimony of an expert witness who had not been previously identified as an expert, in compliance with Civil Rule 26(E) and Local Rule 21.

"The trial court erred by not excluding expert testimony regarding the cause of asphyxic brain damage when defendants failed to supplement discovery pursuant to Civil Rule 26(E)(1)(b) and Local Rule 21.''

Plaintiffs' assignments of error lack merit.

In their first assignment of error, plaintiffs argue the trial court erred when it denied plaintiffs' motion *in limine* and permitted Dr. Thomas Laipply, a pathologist, to testify as an expert witness since: (1) Dr. Laipply was not previously identified as an expert witness; and (2) plaintiffs were not provided a report containing Laipply's opinions as required by Civ. R. 26 and Loc. R. 21. Defendant Isakov contends: (1) Dr. Laipply was not an expert witness, but a "factual" witness; and (2) the plaintiffs were aware of Dr. Laipply's report and opinions since his pathology report was contained in plaintiffs' medical records. These medical records were admitted into evidence as a plaintiffs' exhibit.

"The trial court has broad discretion in the admission and exclusion of evidence and an appellate court will not reverse the judgment of the trial court for failure to admit or exclude evidence *unless the trial court has clearly abused its discretion and the party complaining has been materially prejudiced thereby. State* v. *Withers* (1975), 44 Ohio St. 2d 53 [73 O.O. 2d 280]." (Emphasis added.) *DiPietro* v. *DiPietro* (1983), 10 Ohio App. 3d 44, 46, 10 OBR 52, 55, 460 N.E. 2d 657, 661. See, also, *State* v. *Sage* (1987), 31 Ohio St. 3d 173, 31 OBR 375, 510 N.E. 2d 343, paragraph two of the syllabus.

Civ. R. 26(E)(1) provides in relevant part as follows:

"A party is under a duty seasonably to supplement his response with respect to any question directly addressed to * * * (b) *the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify.*" (Emphasis added.)

Moreover, expert testimony may

be excluded as a sanction for the violation of Civ. R. 26(E)(1)(b). *Jones* v. *Murphy* (1984), 12 Ohio St. 3d 84, 12 OBR 73, 465 N.E. 2d 444, syllabus; *Shumaker* v. *Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St. 3d 367, 370, 28 OBR 429, 431, 504 N.E. 2d 44, 47.

Former Cuyahoga County Court of Common Pleas, General Division, Local Rule 21, Part I, provided in pertinent part as follows:

"(B) * * * [E]ach counsel shall exchange with all other counsel the written reports of medical and expert witnesses he expects to testify * * *.

"(C) Expert witnesses whose reports have not been furnished to opposing counsel prior to a pretrial held within sixty (60) days before trial, will not be permitted to testify at the trial * * *."

Under Loc. R. 21, Part I, the trial judge has discretion to exclude expert testimony when the party presenting such expert failed to provide the opposing party with the name of the expert. *Paugh & Farmer, Inc.* v. *Menorah Home for Jewish Aged* (1984), 15 Ohio St. 3d 44, 46, 15 OBR 142, 143, 472 N.E. 2d 704, 706.

Contrary to plaintiffs' argument, neither Civ. R. 26(E)(1)(b) nor Loc. R. 21, Part I, is applicable to the case *sub judice*. Both rules provide for the exclusion of *expert* testimony when the party presenting the expert fails to identify such expert to the opposing party. However, Dr. Laipply testified not as an expert, but as a factual witness.

Dr. Laipply testified concerning only the results of a pathological examination he conducted upon the mother's placenta. Dr. Laipply testified to both the gross description (size, shape, weight and color) and microscopic composition of the mother's placenta. While presenting a gross description of the placenta, Laipply noted the surface of the placenta fac-

ing the infant and amniotic fluid were greenish gray which is an abnormal discoloration due to the meconium staining. The microscopic examination of the mother's placenta revealed macrophage cells with meconium inside. Laipply explained that macrophage cells are scavenger cells which ingest foreign material, such as meconium, in the placental tissue. Dr. Laipply also showed several slides to the jury depicting the mother's placenta.

It is important to note the trial court granted plaintiffs a motion *in limine* part way through Dr. Laipply's testimony. The trial court prohibited Dr. Laipply from expressing his opinion as to the *period of time* that may have elapsed after a release of the meconium into the amniotic fluid to cause the meconium staining of the mother's placenta. This ruling effectively precluded defendant Isakov from obtaining any expert testimony from Dr. Laipply concerning the ultimate issues in the case, *viz.*: (1) whether defendants' unsuccessful forceps delivery was the proximate cause of the infant's brain damage; and (2) the period of time it would take to stain the placenta to the extent revealed to Dr. Laipply on the pathology slides. In addition, defendant Isakov did not present a hypothetical question to Dr. Laipply for the purpose of establishing the proximate cause of the infant's injury.

Since Dr. Laipply's testimony was limited to the results of a pathological examination he conducted on the mother's placenta, and Laipply did not express an opinion on the ultimate issue in the case *sub judice,* we find Dr. Laipply did not present any expert testimony and thus Civ. R. 26 and Loc. R. 21 are inapplicable. *Broach* v. *Midland Steel Products Co.* (1984), 16 Ohio App. 3d 425, 427, 16 OBR 495, 498, 476 N.E. 2d 374, 376; *Zinsmeister*

v. *Leamon* (May 2, 1985), Cuyahoga App. No. 49028, unreported.

Plaintiffs' contention that Dr. Laipply's testimony should have been excluded on the ground plaintiffs never received a copy of the doctor's report, as required under Civ. R. 26(E) and Loc. R. 21, is similarly unpersuasive. As stated above, Dr. Laipply presented factual evidence and did not present expert testimony; therefore, he was not an expert witness. Thus, the requirements of Civ. R. 26(E) and Loc. R. 21 were inapplicable to Dr. Laipply.

Furthermore, the record clearly indicates the only report defendant Isakov used during the direct examination of Dr. Laipply was the doctor's "Pathology Report." A copy of Laipply's report was contained in plaintiffs' medical records which plaintiffs admitted into evidence as "Exhibit One." In *Huffman* v. *Hair Surgeon, Inc.* (1985), 19 Ohio St. 3d 83, 86, 19 OBR 123, 125, 482 N.E. 2d 1248, 1251, the court considered the civil discovery rules, and specifically Civ. R. 26(E), and stated the purpose of the rule " '* * * is to *prevent surprise to either party* at the trial or to avoid hampering either party in preparing its claim or defense for trial. * * *' " (Emphasis added.) Considering Dr. Laipply's pathology report concerning the mother's placenta was admitted into evidence by the plaintiffs, it would be incongruous for this court to find plaintiffs were surprised by defendant Isakov's use of Dr. Laipply's pathology report and testimony. Dr. Laipply was identified in Dr. Isakov's witness list as a factual witness and he was used as such.

Since Dr. Laipply did not act as an expert witness for Dr. Isakov and plaintiffs were well aware of the nature of Laipply's testimony, as evidenced by Laipply's pathology report in plaintiffs' medical records exhibit, the trial court did not abuse its discretion when it permitted Dr. Laipply to testify as a factual witness for defendant Isakov.

In their second assignment of error, plaintiffs argue the trial court erred when it overruled plaintiffs' objection and permitted Dr. Isakov's expert Dr. Lucy Rorke, a pathologist, to express an opinion at trial when during her pretrial deposition she testified she had no opinion on the same issue, *viz.,* the cause of the infant's hypoxic ischemic injury. Defendant Isakov contends Dr. Rorke's opinion was proper since during the pretrial discovery stage of the case *sub judice,* Dr. Rorke was not supplied with sufficient information upon which to base her opinion as to the cause of the infant's injuries. This crucial information could have been elicited only at trial *after plaintiffs waived* the physician-patient privilege with Dr. Laipply.

Civ. R. 26(E)(1) provides as follows:

"A party is under a duty seasonably to supplement his response with respect to any question directly addressed to * * * (b) the identity of each person expected to be called as an expert witness at trial *and the subject matter on which he is expected to testify.*" (Emphasis added.)

It is well-established that expert testimony may be excluded as a sanction for the violation of Civ. R. 26(E)(1)(b). *Shumaker* v. *Oliver B. Cannon & Sons, Inc., op. cit.; Jones* v. *Murphy, supra,* at 86, 12 OBR at 75, 465 N.E. 2d at 445; *Huffman* v. *Hair Surgeon, Inc., supra.* The failure of a party to supplement discovery when its expert witness formulates or changes an opinion may be grounds for reversible error. *Shumaker, supra; Jackson* v. *Booth Memorial Hosp.* (1988), 47 Ohio App. 3d 176, 547 N.E. 2d 1203.

In the case *sub judice,* Dr. Isakov contends he could not elicit necessary

factual testimony from Dr. Laipply due to the physician-patient privilege embodied in R.C. 2317.02(B). Once the privilege was waived, defendant Isakov argues, Dr. Laipply could testify to information not contained in the hospital records. Dr. Isakov was then able to present his expert, Dr. Rorke, with a hypothetical question upon which she could base her opinion. In response to defendant Isakov's argument, plaintiffs assert the physician-patient privilege contained in R.C. 2317.02(B), and applicable to Dr. Laipply, was waived when plaintiffs filed their medical malpractice claim and thus Dr. Isakov had pretrial access to Dr. Laipply's testimony.

R.C. 2317.02(B), as it was in effect at the time of trial (see 141 Ohio Laws, Part III, 4865, 4871-4872), provided in relevant part as follows:

"The following persons shall not testify in certain respects:

"* * *

"(B) A physician concerning a communication made to him by his patient in that relation or his advice to his patient, except that the physician may testify by express consent of the patient * * * and except that, if the patient voluntarily testifies or is deemed by section 2151.421 of the Revised Code to have waived any testimonial privilege under this division, the physician may be compelled to testify on the same subject, or if the patient * * * files a medical claim, as defined in division (D)(3) of section 2305.11 of the Revised Code, the filing shall constitute a waiver of this privilege with regard to the care and treatment of which complaint is made. This division applies to doctors of medicine, doctors of osteopathic medicine, and doctors of podiatric medicine."

In *Moore* v. *Grandview Hospital* (1986), 25 Ohio St. 3d 194, 25 OBR 259, 495 N.E. 2d 934, the court considered a claim that a plaintiff waived her physician-patient privilege when she filed a malpractice action. The *Moore* court stated at 196, 25 OBR at 260-261, 495 N.E. 2d at 936:

"R.C. 2317.02(B) also provides that the filing of a medical claim operates as a waiver of the physician-patient privilege '*with regard to the care and treatment of which complaint is made.*' (Emphasis added.) This section clearly is designed to allow a *physician who is being sued* for malpractice to discuss privileged matters so that he might effectively defend himself." (Emphasis added in part.)

Thus, contrary to plaintiffs' argument, the *Moore* court refused to use the "filing of medical claim" clause of R.C. 2317.02(B) as a blanket waiver of the physician-patient privilege. Cf. *State, ex rel. Floyd,* v. *Court of Common Pleas* (1978), 55 Ohio St. 2d 27, 28, 9 O.O. 3d 16, 16-17, 377 N.E. 2d 794, 795. The above material indicates privilege is only waived relating to a physician when suit is brought against him in a malpractice claim with regard to his care and treatment of the patient-plaintiff so that he may effectively defend himself. However, Dr. Laipply was not being sued for malpractice.

Under R.C. 2317.02(B), a patient may waive the privilege by voluntarily testifying as to the privileged matter, which may consist of admitting into evidence records containing privileged communications. *Rosenfeld* v. *Apgar* (Mar. 21, 1985), Cuyahoga App. No. 48871, unreported, at 6. When a patient elicits testimony as to part of the physician-patient relationship, the privilege is waived as to the entire relationship. *Rosenfeld, supra.*

In the case *sub judice,* the trial court partially granted plaintiffs' motion *in limine* to preclude defendant Isakov from using Dr. Laipply as an expert witness. The trial court permitted Dr. Laipply to testify only as a

factual witness. During an in-chambers hearing on plaintiffs' motion before the trial court, defendant Isakov's counsel made the following proffer:

"[Dr. Laipply] * * * is prepared to testify that Mr. Guidubaldi [plaintiffs' counsel] called him up more than a week ago, approximately a week ago, asked him questions about the meconium staining, asked him questions about the procedure of preserving the specimen, asked him what the 4-S on his report meant as to slides and then instructed him to make sure he didn't talk to the other side because the privilege had [not] been waived.

"Within a technical concept the privilege is probably not waived as to a treating physician or a caring physician or someone rendering care to the mother until the hospital records were placed in evidence in this case.

"Now, the witness has just testified that the first time he talked to me [Dr. Isakov's defense counsel] was Sunday, and that is when I requested that he make blow-up pictures of the slides.

"Certainly, I was prevented from discussing with this witness, without having him commit a criminal violation, anything to do with his conclusions about those slides until the privilege had been waived. And counsel was certainly well aware of that because he instructed the witness accordingly and he [Dr. Laipply] will so testify."

It is important to note plaintiffs' counsel could have settled the dispute concerning Dr. Laipply's testimony, viz., whether plaintiffs' counsel informed Dr. Laipply not to speak with defendants' counsel because the physician-patient privilege had not been waived, by simply placing Dr. Laipply on the witness stand, under oath and outside the presence of the jury, and inquiring whether such a conversation took place. It is difficult to

understand how plaintiffs were "surprised or ambushed," as they claim, by the presentation of the defense evidence pertaining to Dr. Laipply's testimony at trial since the plaintiffs controlled the waiver of privilege concerning Dr. Laipply.

Dr. Laipply's name was on defendant Isakov's witness list as a factual witness. Dr. Isakov's witness list was hand-delivered to plaintiffs' counsel on October 23, 1987, which was three days prior to the start of trial on October 26, 1987. Thus, plaintiffs clearly had notice of defendant Isakov's intention to call Dr. Laipply as a defense witness. In addition, after the trial court permitted Dr. Laipply to testify as a factual witness, plaintiffs failed to request a continuance in order to counter or rebut Dr. Laipply's testimony.

Consequently, the physician-patient relationship which existed between plaintiffs and Dr. Laipply was waived when plaintiffs introduced Dr. Laipply's pathology report as "plaintiffs' exhibit one." Having determined Dr. Laipply's testimony was properly admitted in plaintiffs' first assignment of error and Dr. Isakov did not have access to Laipply's testimony until plaintiffs admitted his report into evidence at trial and waived the physician-patient privilege contained in R.C. 2317.02(B), the issue becomes whether Dr. Isakov violated Civ. R. 26(E)(1) by failing to supplement discovery and provide plaintiffs notice of Dr. Rorke's "newly formed" opinion.

Civ. R. 26(E)(1) and Loc. R. 21 require a party to provide an opposing party with an expert's report prior to trial in order for such expert to testify at trial. Shumaker, supra. However:

"[Loc. R. 21(B)] does not require the proponent of expert testimony to provide a report which exhaustively discloses all knowledge which the ex-

pert might potentially supply. *The expert's ultimate testimony may well depend on the predicate facts which counsel develops during the trial.* Instead, the rule implicitly calls for the proponent's good faith effort to supply a report which covers the general area of the expert's prospective testimony. If counsel misperceives underlying facts or governing legal rules, the expert will presumably explain the later established facts according to those later established legal rules." (Emphasis added.) *Ban* v. *CTI-Nuclear, Inc.* (Oct. 3, 1985), Cuyahoga App. No. 49578, unreported, at 8.

In the case *sub judice,* Dr. Rorke did not formulate any new opinion or theory as to the infant's injuries since Dr. Rorke contended throughout the proceedings the infant's injuries were inconsistent with those inflicted by forceps. At her pretrial deposition, Dr. Rorke testified the only opinion she had as to the cause of plaintiff's brain damage was that it was "most consistent with hypoxic ischemic injury." When Dr. Rorke was asked at the deposition whether she had an opinion as to what caused the infant's hypoxic ischemic injury, she replied "no."

At trial Dr. Rorke set forth the opinion that the infant's brain damage was not consistent with the type of injury forceps would cause, *viz.,* swelling, bleeding, lacerations, hemorrhages in the scalp and skull fractures. Dr. Rorke further testified that the infant's brain damage was consistent with a hypoxic ischemic injury. Dr. Isakov's counsel then inquired whether Dr. Rorke had an opinion, based solely on plaintiffs' medical records, as to what caused the infant's hypoxic ischemic injury. Dr. Rorke replied: "No. Because the records leave out important things that I would need in order to draw an opinion."

Finally, Dr. Isakov's counsel put forth a hypothetical question to Dr. Rorke which contained facts elicited at trial from Dr. Laipply and plaintiffs' expert Dr. Rosen. Based on defendant Isakov's hypothetical question, Dr. Rorke stated she did have an opinion as to what caused the infant's hypoxic ischemic injury. Dr. Rorke stated her opinion as follows:

"On the basis of the facts which you have listed for me and the jury, and on the basis of my experience in dealing with these matters, the most likely cause of the hypoxic ischemic injury in this baby is some kind of placental insufficiency or decrease in circulation to the infant's brain hours or several days, most likely several days before the baby was born.

"* * *

"One of the most important features which I had known before Mr. Kalur told me in the courtroom, was the observation by the pathologist that the meconium was found within the placenta, in the macrophages and I know as a pathologist that the finding of macrophages within tissues takes several days.

"So this process, as far as this baby was concerned, must have been going on for several days in order for those observations to· have been made."

Dr. Rorke did not formulate any new opinion or theory as to the cause of the infant's injuries since the gist of Dr. Rorke's opinion was the infant's brain damage was not caused by any type of forceps injury. Prior to trial, Dr. Rorke stated the infant's brain damage was caused by hypoxic ischemic injury; however, she was unable to express an opinion as to *what* caused the infant's hypoxic ischemic injury since plaintiffs' medical records did not provide sufficient information upon which Dr. Rorke could express an opinion. However, at trial the parties adduced the evidence Dr. Rorke needed to form an opinion as to the cause of

the infant's hypoxic ischemic injury. For instance, Dr. Laipply testified the mother's placenta was found to be stained with meconium and that macrophages, scavenger cells which "eat" foreign substances in placenta tissue such as meconium, were found in a deeper layer of the placenta. Moreover, plaintiffs' expert Dr. Rosen testified the mother's placenta was deeply stained with meconium and the depth of stain is in direct correlation with the amount of time the placenta was exposed to meconium. Dr. Rosen also admitted the infant's nails were stained with meconium and such staining indicated the infant was exposed to meconium at least four to six hours prior to birth. Considering the above, defendant Isakov did not violate Civ. R. 26(E)(1)(b) when he failed to supplement discovery since Dr. Rorke did not express any newly formulated opinion or theory which would warrant such notice to the plaintiffs.

Plaintiffs contend the situation in the case *sub judice* is identical to *Jackson* v. *Booth Memorial Hosp.* (1988), 47 Ohio App. 3d 176, 547 N.E. 2d 1203. In *Jackson, supra,* of defendant's three experts, only one expressed an opinion prior to trial as to the cause of plaintiff's death, *viz.,* "cardiac authymia [*sic*]." Plaintiff filed a pretrial motion *in limine* to prevent defendant's experts from testifying as to any previously unrevealed theory on the cause of plaintiff's death. However, at trial, over plaintiff's objection, the trial court permitted all three of defendant's experts to testify concerning a new theory as to what caused plaintiff's death, *viz.,* preeclamptic shock. This cause of death was discovered *after* the depositions of defendant's experts but *prior* to trial. The jury returned a verdict for defendant. In *Jackson, supra,* this court reversed and remanded, *inter alia,* since defendant violated Civ. R.

26(E)(2) by failing to timely inform plaintiff prior to trial of the defendant's experts' new theory of the plaintiff's cause of death which was discovered before trial.

The case *sub judice* is clearly distinguishable from *Jackson, supra,* on two grounds: (1) defendant Isakov's expert Dr. Rorke did not change her opinion as to the cause of the infant's brain damage in any manner throughout the proceedings; and (2) Dr. Rorke did not know the cause of the infant's hypoxic ischemic injury until she was presented with additional information at trial. Rorke unequivocally, both before and at trial, indicated the infant's brain damage was not caused by a forceps injury which was the basis of plaintiffs' case. Prior to trial, Dr. Rorke could not express an opinion as to what caused the infant's hypoxic ischemic injury because the medical records were incomplete. However, once additional facts were adduced at trial by Dr. Laipply and plaintiffs' expert Dr. Rosen, Dr. Rorke was presented with a hypothetical question containing information previously not in the record. See Evid. R. 703. Based upon this information contained in the hypothetical question, Dr. Rorke formulated a cause for the infant's hypoxic ischemic injury. In the case *sub judice,* defendant Isakov's expert witness, Dr. Rorke, did not know what caused the infant's hypoxic ischemic injury until trial when she was presented with additional information elicited at trial.

The trial court did not abuse its discretion when it overruled plaintiffs' motion *in limine* and permitted Dr. Rorke to testify since Dr. Rorke's theory as to the cause of the infant's brain damage did not change throughout the proceedings. Rather, Dr. Rorke expressed an opinion as to the cause of the infant's hypoxic ischemic

brain injury after further evidence was placed in the record at the time of trial.

Accordingly, plaintiffs' assignments of error are not well-taken and are overruled.

*Judgment affirmed.*

PATTON, P.J., and MATIA, J., concur.