DECISION AND JUDGMENT ENTRY
Appellants Tamar and Larry Williams appeal the judgment of the Lucas County Court of Common Pleas in favor of appellees Frederick A. Bunge, M.D. and Toledo ENT, Inc. following a jury trial. Because we conclude that the trial court did not abuse its discretion in permitting the defense to elicit opinion testimony from the various treating physicians and in allowing the defense medical experts to render opinions based partially on deposition testimony, we affirm.
In June 1999, Tamar Williams underwent a biopsy of a mass that was on the right side of her neck. Dr. Bunge, a board certified otolaryngologist who specializes in head and neck surgery,[1] performed the biopsy at the Reynolds Road Surgical Center, an outpatient surgical facility. During the procedure, her carotid artery was torn. Dr. Peter Vandermeer, one of Bunge's partners, was called in to assist. Vandermeer repaired the carotid artery, and Tamar was immediately transferred to Toledo Hospital, where Dr. Andrew Seiwert, a vascular surgeon, finished removing the mass and further repaired the carotid artery. He also removed two blood clots. When the blood flow did not return to normal, Seiwert discovered that there was a third clot in the middle cerebral artery. Due to its location, he could not remove this clot, and Tamar suffered a stroke.
Appellants filed a medical malpractice action against Bunge and his employer, Toledo ENT.[2] The case was heard by a jury in April 2002, and several medical experts were called on behalf of both parties. The jury was asked to determine whether Bunge was negligent in his pre-operative workup in failing to diagnose the mass as a carotid body tumor and in failing to stop the biopsy when he saw where the mass was located. The jury found that Bunge did not fail to exercise ordinary reasonable care in his care and treatment of Tamar and returned a verdict in favor of appellees. On appeal, appellants set for the following seven assignments of error:
"I. The trial court abused its discretion and erred to the substantial prejudice of plaintiffs by permitting defendants to elicit expert testimony from Dr. Peter Vandermeer when Dr. Vandermeer had not been identified by defendants as an expert witness.
"II. The trial court abused its discretion and erred to the substantial prejudice of plaintiffs by permitting defendants to elicit expert testimony from Dr. Ronald Hamaker, who was not properly qualified to testify as an expert witness.
"III. The trial court abused its discretion and erred to the substantial prejudice of plaintiffs by permitting defendants to elicit expert testimony from Dr. Hamaker that was not based upon facts perceived by Dr. Hamaker or upon facts made known to him through a hypothetical question.
"IV. The trial court abused its discretion and erred to the substantial prejudice of plaintiffs by permitting defendants to elicit expert testimony from Kevin Martin that was not based upon facts perceived by Dr. Martin or admitted into evidence.
"V. The trial court abused its discretion and erred to the substantial prejudice of plaintiffs by permitting defendants to elicit expert testimony from Dr. Robert Booth that was not competent under Daubert v. Merrill Dow Pharmaceuticals (1993),509 U.S. 579, as adopted by the Ohio Supreme Court in Miller v.Bike Athletic Co. (1998), 80 Ohio St.3d 607, 611.
"VI. The trial court abused its discretion and erred to the substantial prejudice of plaintiffs by permitting defendants to elicit expert testimony from Dr. Robert Booth that was beyond the scope of his expertise.
"VII. The trial court abused its discretion and erred to the substantial prejudice of plaintiffs by permitting defendants to elicit expert testimony from Dr. Andrew Seiwert when Dr. Seiwert had not been identified by Defendant as an expert witness."
All of the assignments of error concern the admission of opinion and expert testimony of five separate witnesses. Appellants contend that the admission of this evidence prejudiced them and resulted in an unfair trial.
The admission of expert testimony is a matter within the sound discretion of the trial court. Scott v. Yates (1994),71 Ohio St.3d 219, 221. A reviewing court will not reverse the decision of the trial court absent an abuse of discretion. Id. An abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude, in reaching its decision, was arbitrary, unreasonable, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
We will consider the assignments of error as they relate to the specific physicians.
 Dr. Vandermeer
In the first assignment of error, appellants argue that Bunge's partner, Dr. Peter Vandermeer, should not have been permitted to testify as an expert witness because he had never been identified by appellants as such. Appellees respond that, as one of the assisting physicians, Vandermeer had personal knowledge of the appearance of the neck mass and previous experience with carotid body tumors and, therefore, could provide opinion testimony as a lay witness pursuant to Evid.R. 701. They further contend that Vandermeer should be allowed to respond to criticism of his suturing by one of appellants' experts. Appellants reply that appellees elicited Dr. Wright's statements about the suturing and should not be able to profit by error.
Vandermeer's testimony concerned the characteristics of carotid body tumors in general, whether the mass in Williams' neck appeared to be a carotid body tumor, and whether he, himself, had met the appropriate standard of care in suturing Tamar's carotid artery. Evid.R. 701 provides:
"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."
Even though appellants argue that Evid.R. 701 is inapplicable, courts have used Evid.R. 701 to permit treating physicians to render opinions based upon their personal observations and perceptions. See Gannett v. Booher (1983), 12 Ohio App.3d 49,52 (whether testifying as an expert or lay witness, treating physician was properly permitted to give opinion testimony based on his personal observations and perceptions); Fischer v. DairyMart Convenience Stores, Inc. (1991), 77 Ohio App.3d 543,555-556 (doctors' opinions were rationally based on their own perceptions and were helpful to the determination of causation and therefore were admissible pursuant to Evid.R. 701). Vandermeer testified that the mass was not a carotid body tumor based on his personal observation of Tamar. His testimony about his earlier experience with carotid body tumors is relevant to support his opinion. See State v. McKee (2001),91 Ohio St.3d 292, 295 (it is important to show a foundation of sufficient familiarity with the subject matter to support the opinion). Appellants themselves asked Dr. Seiwert, another treating physician, to testify about carotid body tumors in general as well as whether Tamar's mass was this type of tumor.[3]
Furthermore, before evidence is found to have been improperly admitted, an appellant must present evidence of being prejudiced by the admission of the testimony. Reese v. Euclid CleaningContrs., Inc. (1995), 103 Ohio App.3d 141. Whether the testimony results in surprise at trial is a matter left to the sound discretion of the trial court. State v. Diehl (1981),67 Ohio St.2d 389, 391. Without surprise, there is no abuse of discretion. Long v. Isakov (1989), 58 Ohio App.3d 46, 51. "This court has also found that when a complaining party knows the identity of the other party's expert, the subject of his expertise and the general nature of his testimony, a party cannot complain that they [sic] are ambushed." Kalina v. Sagen (Mar. 25, 1992), 8th Dist. No. 59761; Cherovsky v. St. Luke'sHosp. (Dec. 14, 1995), 8th Dist. No. 68326.
Because appellants had named Vandermeer as a defendant in this action, they knew his involvement in this case. Vandermeer was also deposed by appellants. Therefore, it cannot be shown that they were surprised by Vandermeer's testimony. In addition, the only standard of care question posed to Vandermeer concerned whether he personally had met the standard of care when suturing Tamar's carotid artery. While this testimony may have been somewhat irrelevant, appellants have not shown how this testimony prejudiced them.
Based on the above, we find the first assignment of error not well-taken.
 Dr. Hamaker's Qualifications
The second assignment of error alleges that Dr. Ronald Hamaker was not properly qualified to testify as an expert witness because it was not established he devoted at least half of his professional time to the active clinical practice in his field.
Evid.R. 601(D) provides:
"Every person is competent to be a witness except:
"(D) A person giving expert testimony on the issue of liability in any claim asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, unless the person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state, and unless the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school. This division shall not prohibit other medical professionals who otherwise are competent to testify under these rules from giving expert testimony on the appropriate standard of care in their own profession in any claim asserted in any civil action against a physician, podiatrist, medical professional, or hospital arising out of the diagnosis, care, or treatment of any person."
The purpose of Evid.R. 601(D) is "to preclude testimony by the physician who earns his living or spends much of his time testifying against his fellows as a professional witness, and to prevent those whose lack of experiential background in the very field they seek to judge, the clinical practitioner, makes the validity of their opinions suspect, from expressing those opinions for pay or otherwise." McCrory v. State (1981),67 Ohio St.2d 99, 103.
The determination of whether or not a medical witness is competent to testify lies within the sound discretion of the trial court. The qualifications of an expert is a matter for determination by the court on the facts, and rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion. Campbell v.Warren Gen. Hosp. (1994), 105 Ohio App.3d 417, 421, quotingAkron v. Pub. Util. Comm. (1967), 5 Ohio St.2d 237, 242.
Hamaker stated that he spends 60 to 70 percent of his time on "programs and other things." While appellants characterize this an insufficient to meet the 50 percent requirement, appellees argue this statement simply amplifies his response that he devotes 60 to 70 percent of his time to patient care and that he testified to other activities also related or adjunctive to patient care.
The following testimony was given at trial concerning Hamaker's qualifications:
"Q: All right. And could you tell me what percentage of your professional time is spent either in teaching or the active clinical practice of medicine?
"A: Well, you got to realize my whole life changed in 1998. I had a tumor and at that point I wanted to eliminate the stress of the head and neck cancer and big tumors. So I now only do thyroids and parathyroids and I do probably one to two of those a week. I see head and neck tumors with my colleagues as a consultant at this time every Wednesday. And today they're seeing 15 to 17. One of those numbers, I don't remember what the girl said, 15 tumors of the head and neck.
"Q: So of the time that you spend away from home and dealing with patients, what percentage of your time would that be?
"A: Oh, probably 60, 70 percent I'm working on programs and other things."
Williams objected when Dr. Hamaker was asked whether Dr. Bunge had obtained a reasonable and appropriate history, arguing that Evid.R. 601(D) had not been satisfied. After a bench conference, the following additional testimony was elicited from Dr. Hamaker about his qualifications.
"Q: I will come back to this in just a moment. Let me back up a minute and talk to you just a little bit more about your current clinical activities. And let me talk about that in terms of the last few years. Do you in your professional time engage at all in any review or evaluations of head and neck tumors and masses?
"A: Yes.
"Q: Tell the jury about that, please.
"A: Well, I'm the founder of Head and Neck Surgery Associates. And each of my partners was trained by me. So I'm the daddy. And I'm the one that the most of the patients come to see. And I go to other clinics. I have an Illinois license because I go to the Carlyle clinic. And there I'm a consultant and see the patients with another young man that I trained. And I go to Terra Haute and I see patients by myself. And these are patients that are coming in specifically because of a head and neck problem.
"Q: Do you consult on head and neck surgical procedures?
"A: Yes, in the operating room with my colleagues. Now, what I have done is I've eliminated the responsibility of the surgeon. I don't believe anyone realizes how much responsibility the surgeon places upon himself when the patient says yes, I'll go to the operating room and have this taken out. It's tremendous."
Even if Hamaker's testimony is interpreted to mean that he spends 60 to 70 percent of his professional time on "programs and other things," we find that the trial court did not abuse its discretion in permitting Hamaker's testimony. In McCrory, the Ohio Supreme Court defined the term "active clinical practice" to include "physician-specialists who work daily in * * * assisting, directing, or advising the attending physician in his care of the sick. Such physicians are directly involved in the care of the patient and are usually aware of the progress of the treatment of his health problems and of that treatment's ultimate result. Their ministrations form inseparable parts of that patient's care." McCrory, 67 Ohio St.2d at 103. So while the phrase `active clinical practice" primarily describes those physicians who spend at least one half of their professional time treating patients, it also includes the physician-specialist whose work is so related or adjunctive to patient care. Id. at 104.
After appellants objected to the foundation for his testimony, Hamaker was asked to clarify how he spent his professional time. He explained that those "other things" included consulting with his partners, consulting at the Carlyle clinic, and consulting at a clinic in Terra Haute. While he no longer performs the head and neck cancer surgeries, he is present in the operating room. His consulting activities deal directly with patient care and satisfy "the active clinical practice" definition as set forth inMcCrory.
We find the second assignment of error not well-taken.
 Dr. Hamaker and Dr. Martin's Opinions
In the third and fourth assignments of error, appellants argue that the trial court erred in allowing Drs. Ronald Hamaker and Kevin Martin to render expert opinions because their opinions were based on information that they did not perceive and that was not admitted into evidence. Specifically, appellants claim that Hamaker and Martin impermissibly based their opinions on the deposition of Vandermeer when Vandermeer's deposition was not admitted into evidence.
Evid.R. 703 states "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." Evid.R. 705 provides: "The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."
In Loura v. Adler (1995), 105 Ohio App.3d 634, the defendant doctor asserted that plaintiff's expert should not have been permitted to testify because his expert opinion was impermissibly based upon depositions which were not part of the record. TheLoura court noted that Evid.R. 703 was modified by State v.Solomon (1991), 59 Ohio St.3d 124 and that the foundational requirement was relaxed to the extent that where an expert bases his opinion, in whole or in major part, on facts or data perceived by him or that are admitted into evidence the requirement of Evid.R. 703 has been satisfied. Loura,105 Ohio App.3d at 641-642. While the appellate court determined that the expert's opinion was based in major part upon the medical records, it also noted that all but one of the deposed physicians testified at trial and there was no evidence presented to the effect that the physicians' testimony at trial was substantially different than that given upon deposition. Id. at 642. See, also,State v. Williams, 10th Dist. No. 02AP-507, 2003-Ohio-2694 (expert's opinion was admissible because the facts relied upon were introduced into evidence via later testimony of another witness).
Although Vandermeer's deposition was not admitted into evidence, he did testify at trial. A review of his deposition and trial testimony shows that his testimony was consistent. Therefore, the facts that Hamaker and Martin relied upon in rendering their opinions were in evidence. In addition, a review of Martin's testimony shows that he principally relied on the medical records and operative reports of Bunge and Seiwert in rendering most of his opinions. These reports were admitted into evidence. He also rendered opinions after being informed about how other witnesses testified or in response to hypothetical questions.
We find the third and fourth assignments of error not well-taken.
 Dr. Booth
In the fifth and sixth assignments of error, appellants contend that Dr. Robert Booth was not competent to render an opinion and that in his testimony he exceeded the scope of his expertise. Booth is a pathologist and a professor at the Medical College of Ohio. At trial, he testified that, in his expert opinion, the mass removed from Tamar's neck was compatible with a paraganglioma tumor; however, he found it was an atypical paraganglioma based upon his review of the frozen section slides, final surgical slides, and the special stains that were done. When asked whether the mass was a carotid body tumor, Booth testified that he could not say because he was not familiar with how the tumor presented or where it was located.
The determination of whether a witness possesses the qualifications necessary to allow expert testimony and introduce evidence lies within the sound discretion of the trial court. In addition, the qualification of an expert witness will not be reversed unless there is a clear showing of an abuse of discretion on the part of the trial court. State v. Maupin
(1975), 42 Ohio St.2d 473, 479; State v. Minor (1988),47 Ohio App.3d 22, 25.
In Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, the Ohio Supreme Court expressly adopted Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579, 125 L.Ed.2d 469,113 S.Ct. 2786, which set forth a four-factor test to determine the reliability of scientific evidence: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. Although these factors may aid in determining liability, the inquiry is flexible.
Evid.R. 702 provides:
"A witness may testify as an expert if all of the following apply:
"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is only reliable if all of the following apply:
"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
"(2) The design of the procedure, test, or experiment reliably implements the theory;
"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
Appellants characterize the testimony of Booth as incompetent because he had not inspected the tumor in gross[4] or at the location where it was found in Tamar's neck. Appellants also question the reliability of Booth's opinion because he had never before rendered a diagnosis with respect to a carotid body tumor and had never actually seen a carotid body tumor either in gross or in dissection. In order to reverse the trial court's decision regarding the reliability of Booth's testimony, there must be a clear abuse of discretion. Such abuse is not present in this case. Appellants do not question Booth's qualifications as a pathologist. Instead, they contend that his opinion was inadmissible because he did not actually see the mass.
Based on our review of the evidence, we conclude that the trial court did not abuse its discretion in allowing Booth's testimony. There was no evidence to indicate that a pathologist must review the specimen in gross or in dissection before rendering an opinion. Booth testified that his microscopic evaluation stands alone and that it would not be affected by not seeing the mass itself. A video deposition of Dr. Peter Smythe, a pathologist at the Toledo Hospital, was played during appellants' case-in-chief. Nothing in his testimony indicates that it is necessary to examine a specimen in gross before rendering an opinion. A review of Smythe's final pathology report indicates that his diagnosis was based on the microscopic description.
Furthermore, a number of the medical experts testified that a carotid body tumor is simply one type of paraganglioma. Whether a paraganglioma is a carotid body tumor depends upon its location in the body; it otherwise shares the same general characteristics of other paragangliomas. Although Booth may never have seen a carotid body tumor before, he testified that he is familiar with, and has seen other types of, paragangliomas such as pheochromocytoma and small cell carcinomas. Booth's testimony, therefore, did not exceed the scope of his expertise.
We, therefore, find the fifth and sixth assignments of error not well-taken.
 Dr. Seiwert
The seventh assignment of error regarding Dr. Andrew Seiwert's testimony is similar to the first concerning Dr. Vandermeer's. Seiwert had been identified only as a treating physician, rather than as an expert witness. In addition, Seiwert's testimony is challenged as exceeding the scope of direct examination because no standard of care testimony had been elicited from him by appellants. Appellees respond that appellants had identified Seiwert as an expert witness within their own identification of expert witnesses filed February 15, 2001 and that Seiwert was deposed so there was no surprise or prejudice regarding his cross-examination.
At bench conference, the trial court and counsel reviewed appellants' witness disclosure. The document states: "The following is a list of the witnesses, expert and lay, that Plaintiffs intend to call or present by videotape at the trial of this matter." The witness list then presented five different categories of witnesses: liability experts, treating physicians, other medical providers, damage experts and lay witnesses." Seiwert was included on the disclosure as a treating physician. After reviewing the document, the trial court stated that "based upon the disclosure that was made in referennce [sic] to experts to be called and the deposition that was previously taken we will allow the question to be asked in reference to standard of care."
Appellants had identified Seiwert as an expert in the February 15, 2001 identification of expert witnesses. In the witness list filed March 7, 2002, appellants identified expert witnesses and lay witnesses, and Seiwert was not included in the specific listing for lay witnesses. He was instead listed as a treating physician. Appellees included their witness list as part of their trial brief filed March 13, 2002. They reserved the right to call "all medical expert witnesses identified by Plaintiffs." Based on this reservation, we conclude that the trial court did not abuse its discretion in allowing the defense to ask Seiwert whether he had an opinion as to Bunge's negligence.
Furthermore, appellants themselves elicited a number of opinions from Seiwert during his direct examination, including whether Bunge's surgery was the cause of the blood clot discovered in Tamar's middle cerebral artery. Appellants did not ask Seiwert the ultimate question regarding Bunge's negligence. Based on the totality of appellants' examination of Seiwert, however, appellees were entitled to pursue whether Seiwert had an opinion on whether Bunge was negligent. We, therefore, find the seventh assignment of error not well-taken.
Upon consideration, therefore, we overrule all assignments of error and find that substantial justice was done appellants. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal.
Judgment affirmed.
Pietrykowski, J. Lanzinger, J. Singer, J. CONCUR.
[1] An otolaryngologist is also known as an ENT — Ear, Nose and Throat physician.
[2] Also named in the amended complaint were Reynolds Road Surgical Center and Dr. Vandermeer. These defendants were later dismissed.
[3] Appellants also claim that Dr. Seiwert was not called an expert witness in the seventh assignment of error.
[4] Examination in gross means an examination of the whole specimen without aid of a microscope.