## CITY OF CLEVELAND

v.

## HAFFEY █

Cleveland Municipal Court, Ohio.

No. 98TRC006884.

Decided Sept. 17, 1998.

84

*George A. Pace, Jr.* and *Edward T. Buelow,* Assistant City Prosecutors, for the city of Cleveland.

*Timothy G. Haffey, Larry W. Zuckerman* and *S. Michael Lear,* for the defendant Dennis M. Haffey.

*Daniel Makee,* for P.H.S. Mt. Sinai Hospital.

SEAN C. GALLAGHER, Judge.

This case is before the court on charges of driving under the influence in violation of Cleveland Codified Ordinances 433.01(a)(1), resisting arrest, C.C.O. 615.08, and failure to control under C.C.O. 431.34.

On January 23, 1998 at 1:40 a.m., Officer Tom Marazzi of the Cleveland Police Department 6th District, responded to a motor vehicle accident at Neff Road and East 185th Street in Cleveland. Officer Marazzi observed that a white Ford van, later determined to be that of the defendant, had struck the rear of another car believed to be a Toyota. Officer Marazzi related that a small crowd of six or seven people pointed to the southwest corner, where they said the man driving the van had run behind a bank. Officer Marazzi went to that location and encountered the defendant, who was peeking behind the corner, talking on a cellular phone. The officer said the defendant tried to flee, but stumbled and appeared intoxicated. The officer related that when he approached the defendant, the defendant began yelling obscenities. The officer claimed that in

addition to the obscenities, the defendant told him he was on the phone with his lawyer and did not have to talk to police. Officer Marazzi then advised the defendant he was under arrest, advised him of his rights, and took him into custody.

C.P.D. Officers Michael Ward and Robert Bartos arrived on the scene shortly after Officer Marazzi. They took the defendant from Officer Marazzi's vehicle and placed him in their cruiser for transport. Officer Ward read the defendant his *Miranda* warnings at that time. The defendant was being transported to the Bratenahl police station for a Breathalyzer test. While preparing to conduct the Breathalyzer test and complete B.M.V. form 2255 and the C.P.D. Alcohol Influence Report form, a scuffle ensued between the defendant and Officer Ward, in which the defendant injured his head. The officers then decided to transport the defendant to P.H.S. Mt. Sinai for treatment.

At the hospital, R.N. Dambreville was the emergency room nurse who provided primary care to the defendant. The defendant fought with the treating room nurses, who had to call security to place him in four-point restraints to be treated. A blood sample was taken and tested at 3:50 a.m., more than two hours after the accident. This sample revealed a concentration of alcohol in the blood of .29 of one percent.

The defendant was transported from the hospital to the police station after treatment at 7:00 a.m. He was again advised of his *Miranda* rights. At this point, the defendant said that he was sorry for what happened and did not remember any part of what happened.

Counsel for the defendant filed a series of pretrial motions requiring hearing and disposition prior to trial. The first, a "Motion *in Limine*," sought to preclude the city from offering any evidence concerning the defendant's prior driving record. The second, a "Motion To Suppress The Results Of The Test Determining Defendant's Blood Alcohol Content," sought to preclude the city from introducing any evidence from test results of the alcohol content of the defendant's blood. This motion also raised the issue of the "Patient Physician Privilege" as outlined under R.C. 2317.02 *et seq.* The third, a "Motion to Suppress Statements," sought to preclude the admission of defendant's statements to police on the grounds of a *Miranda* violation.

In addition to these motions, counsel for P.H.S. Mt. Sinai Hospital, a facility which treated the defendant for injuries after the incident, filed a "Motion to Quash Trial Subpoenas" for its personnel, citing its responsibility to protect the patient-physician privilege under R.C. 2317.02.

## PRIOR CONVICTIONS FOR DUI (MOTION *IN LIMINE*)

■ Counsel for the defendant seeks to preclude the prosecutor and the witnesses for the city from commenting on the fact the defendant had four prior convictions for driving under the influence, two of which were within the statutory period for sentencing-enhancement purposes. Since previous DUI convictions are not elements of subsequent offenses unless the subsequent charge is a felony, the admissibility of convictions or prior instances of conduct is controlled by the Rules of Evidence, specifically, Evid. R. 404, 608, and 609. The fact that a defendant has been arrested, charged, and convicted in a previous case is irrelevant and prejudicial to a present charge. *State v. Allen* (1987), 29 Ohio St.3d 53, 505 N.E.2d 957.

■ The defendant's motion *in limine* is granted. The defendant is advised that the granting of this motion is limited and the defendant must raise the issue at trial, if necessary, to preclude admission of the prior record at trial and to preserve the matter for appeal. *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523. The granting of a motion *in limine* is only a preliminary interlocutory order. It does not determine the admissibility of evidence at trial. *State v. Cherukuri* (1992), 79 Ohio App.3d 228, 607 N.E.2d 56. If the defendant opens the door to admissibility of the prior record at trial, the convictions may, under certain circumstances, be admitted.

## RESULTS OF THE TEST DETERMINING DEFENDANT'S BLOOD–ALCOHOL CONTENT

■ Counsel for the defendant argues that the blood results taken in excess of the two-hour time requirement under R.C. 4511.19 should not be admitted because the results do not conform to the requirements of the Ohio Department of Health as outlined under the Ohio Administrative Code. Ohio Adm.Code Chapter 3701–53.

Counsel for the defendant recognizes the admissibility of blood evidence in excess of the two-hour rule in R.C. 4511.19(A)(1) actions (or any similar municipal ordinance), as outlined in *Newark v. Lucas* (1988) 40 Ohio St.3d 100, 532 N.E.2d 130. The defense claims that the two-hour-rule exception in *Newark* does not exempt the city from the requirements for admissibility under the Ohio Department of Health and Ohio Administrative Code mandates. The defense raises five specific violations of the Ohio Department of Health Blood–Alcohol Testing Rules. The defendant claims (1) that the technician did not have a valid laboratory technician's permit as required under Ohio Adm. Code 3701–53–07, (2) that the laboratory and its personnel did not have a valid permit from the Ohio Department of Health as required under Ohio Adm. Code 3701–53–09, (3) that the

testing method was not approved by the ODH as outlined in Ohio Adm. Code 3701–53–03, (4) that the chain of custody requirements were violated as outlined under Ohio Adm. Code 3701–53–06A and (5) that the sample was not retained for one year as required under Ohio Adm. Code 3701–53–06A.

In the present case, medical personnel withdrew the blood more than two hours after the alleged incident for a medical purpose. The police did not request a sample. In *Newark, supra,* the Ohio Supreme Court held that in a prosecution under R.C. 4511.19(A)(1), or a similar municipal ordinance, the results of a properly administered bodily substances test presented with expert testimony may be admitted into evidence despite the fact that the bodily substance was withdrawn more than two hours from the time of the alleged violation.

"Thus, in R.C. 4511.19(A)(1) driving under the influence cases, chemical tests administered after the two-hour time limit may be admitted into evidence if (1) the pertinent foundational requirements have been satisfied; and (2) the test result is presented with expert testimony to explain the significance of the numerical figure. See, also, *State v. French* (1995), 72 Ohio St.3d 446, 650 N.E.2d 887, in which the Ohio Supreme Court held, *inter alia,* that in order to admit evidence of a chemical test's actual numerical figure in an R.C. 4511.19(A)(1) driving under the influence case, the state must present expert testimony to explain the significance of the figure." *State v. Bevins* (Dec. 29, 1995), Jackson App. No. 94CA750, unreported, 1995 WL 763833.

"In 'per se' or specified limit prosecutions under 4511.19(A)(2), (3) or (4), courts must strictly enforce the two-hour time limit. The basis for this distinction derives from the nature of the prohibited conduct set forth in the statute and the relative importance of the of the chemical test. In a specified limit or 'per se' case, the test result forms the sole basis for a violation. In an R.C. 4511.19(A)(1) case, however, no presumption, either per se or rebuttable, attaches to a chemical test result. Although the test result is not of primary importance in R.C. 4511.19(A)(1) cases, courts may admit the test result along with other evidence of impaired driving to assist the fact finder in determining whether the defendant operated his or her vehicle while under the influence of alcohol. Thus, a defendant's chemical test result is not the critical issue in a driving under the influence case. Rather, the critical issue involves a defendant's ability to perceive, to make judgments, to coordinate movements, and to safely operate a vehicle." See *Lucas* and *Bevins, supra.*

Courts have differed in how the decision in *Newark v. Lucas* should be applied to issues involving the Ohio Administrative Code. In an appeal from Stark County, the Fifth District Court of Appeals, in *State v. Klein* (July 15, 1985), CA–6617, unreported, 1985 WL 8272, but cited in *State v. Bevins, supra,* held that in

order to admit evidence of a test conducted after the two-hour time limit, the test must comply with all other pertinent rules and regulations. See, also, *State v. Gass* (June 25, 1997), Hamilton App. No. C–961062, 1997 WL 346109. In *State v. Wolfrum* (1997), Fulton County F–96–035, 1997 WL 362472, however, the Sixth District held that in a case where laboratory personnel did not have permits issued by the Ohio Department of Health, the test results were still admissible in an R.C. 4511.19(A)(1) prosecution because the evidence went to weight of evidence, not the presumption of intoxication.

In *Mason v. Murphy* (1997), unreported, 1997 WL 632849 the Twelfth District Court of Appeals held that even where a blood test was inadmissible under an R.C. 4511.19(A)(2) prosecution due to failure to comply with ODH regulations, the same result was admissible in an R.C. 4511.19(A)(1) prosecution. The court cited *State v. Hurst* (1991), Hamilton App. No. C–900701, unreported, 1991 WL 243534, which held:

"The specific amount of alcohol or drugs found as a result of the chemical testing of bodily substances is of secondary interest in R.C. 4511.19(A)(1) proceedings, and the test results, if probative, are merely considered in addition to all other evidence of impaired driving."

*State v. Hernandez* (1978), 62 Ohio App.2d 63, 16 O.O.3d 114, 403 N.E.2d 1022, was an aggravated vehicular homicide case which discussed the practical reasoning behind the admissibility of evidence going to weight and not presumption. *Hernandez* held:

"We * * * find that the test, as conducted, can be qualified under generally accepted rules of evidence as having a scientific basis in fact and generally recognized by courts of law; therefore, it was admissible in evidence, independent of heath department regulations specifically dealing with driving while under the influence cases."

The ODH requirements are not necessarily applicable to R.C. 4511.19(A)(1) prosecutions. The burden of proof is different from the standard applied in an R.C. 4511.19(A)(2) case. See *Lucas, Dress,* and *Wolfrum, supra.* The claim that the city should not be able to introduce in an (A)(1) prosecution that which is precluded in an (A)(2) case is without merit, as the burden of proof and instructions of applicable law are different. In the instant case, the city never charged the defendant with an (A)(2) offense. Nevertheless, even if the court was to apply the stricter standards of an (A)(2) case, the city demonstrated "substantial compliance" with the regulations outlined under the ODH and the Ohio Administrative Code.

Substantial compliance does not mean literal compliance. *State v. Plummer* (1986), 22 Ohio St.3d 292, 22 OBR 461, 490 N.E.2d 902. When examining alcohol-

testing regulations the Supreme Court held that "there is leeway for substantial, though not literal, compliance with such regulations." *Id.* at 294, 22 OBR at 464, 490 N.E.2d at 905. See, also, *State v. Casaday* (1987), 40 Ohio App.3d 52, 531 N.E.2d 1325. Rigid compliance with Department of Health regulations in regard to alcohol testing was not necessary in order for test results to be admissible. *State v. Steele* (1977), 52 Ohio St.2d 187, 6 O.O.3d 418, 370 N.E.2d 740,

The Permit Issue

█ In the present case, the defendant claims that the failure of the technician and the laboratory to have a valid permit issued by the Director of Health renders the blood test result invalid. This very argument was rejected in *State v. Dress* (1982), 10 Ohio App.3d 258, 10 OBR 372, 461 N.E.2d 1312. That court held that the statutory requirements were not applicable. The court stated:

"[T]he fact that the hospital lab technician, though otherwise qualified, did not possess a testing permit issued by the Director of Health, goes only to the weight of the test not admissibility." *Id.* at 263, 10 OBR at 378, 461 N.E.2d at 1319.

The lack of a permit issued by the state goes only to the weight of the test result, not its admissibility. *Barber v. Curry* (1974), 40 Ohio App.2d 346, 69 O.O.2d 312, 319 N.E.2d 367, In the instant case, the sample was taken using betadine, a nonvolatile antiseptic, with a sterile dry needle pulled into a sealed vacutainer with a solid anticoagulant in compliance with the ODH standards. The sample was marked, recorded, and immediately transported within twenty seconds by carrier tube to the laboratory. The test was completed within forty-five minutes of its arrival at the lab. The lab technician was employed at the hospital (P.H.S. Mt.Sinai) for twenty-one years, had worked with blood for thirty years, and had conducted "thousands" of blood tests. She had a bachelor's degree in biology from Kent State University and was a registered medical technologist. She was regularly tested by the American Society of Legal Pathology and the Department of Health and was certified by the Medical Society of Clinical Pathologists.

The laboratory director possessed a Ph.d. in analytical chemistry. He was certified by the American Board of Clinical Chemistry. The laboratory itself was certified by the College of American Pathologists, which certifies over 10,000 laboratories in the United States. The lab had obtained federal regulatory certification and was subjected to regular proficiency examinations. It also held a Clinical Laboratory Improvement Act certificate and had never lost certification during the director's tenure.

█ *This court holds that a properly administered medically recognized blood test performed and analyzed by competent professionals in an accredited setting*

*is admissible in an R.C. 4511 .19(A)(1) case despite the absence of ODH permits as required under Ohio Adm.Code 3701–53–09 for the lab and its personnel.*

### The Test Method Issue

 The claim that the test method was not approved by the ODH as either a "gas chromatography" or "enzyme assay" simply misreads the requirement. The list is not exclusive to these two methods. See Ohio Adm.Code 3701–53–03. These are simply two of the approved methods. The amended 1997 rules require that the method be "approved" based on laboratory tests or published studies and that "approved methods" include gas chromatography and enzyme essays. These are not the exclusive methods. Painter (1997), Ohio Driving Under the Influence Law, Section 9.22. (See, also, the same publication, 1998 edition, Section 9.20.)

The test was conducted using a commercial instrument, AX–SYM, manufactured by Abbot Diagnostics. The technique used was "Radiative Energy Attenuation Technology." A portion of the test used enzymatic analysis and used alcohol dehydrogenates. The city produced testimony about how the testing process measured alcohol. The test method was recognized by the federal agency that certified the lab. A manual for the procedure was kept at the lab and utilized by the staff. The control materials were measured twice a day to ensure accuracy of the test. The lab director completed the test controls on the date the defendant's sample was obtained. The director testified that the test revealed the machine was working properly. This was substantially consistent with Ohio Adm.Code 3701–53–04(D). A test reading of .29 percent alcohol was obtained.

The issue in this case is whether the lab testing procedures used were reliable and the person doing the testing had sufficient training and skill to qualify him in that regard. *Dress, supra.* The laboratory was subjected to regular proficiency testing by the College of American Pathologists. Further, any claim that the test involved serum and not whole blood is irrelevant, as the ODH guidelines identify "other bodily substances" as proper for test purposes. See *State v. Perry* (1996), 108 Ohio App.3d 709, 671 N.E.2d 623,

██ *This court holds that laboratory testing methods recognized, adopted, and utilized by medical professionals and professional medical agencies which are supported by published studies or professional certification are "approved methods" for purposes of blood testing under Ohio Adm.Code 3701–53–03 in R.C. 4511.19(A)(1) actions.*

### The Chain-of-Custody Issue

The defendant's claim that the chain-of-custody requirements were violated as outlined under Ohio Adm.Code 3701–53–06(A) does not warrant suppression of

the evidence. The hospital utilizes a computer tracking system for lab items in which the identity of each person who may handle the sample is not necessarily shown.

█ "Proof of the identity of a specimen does not require the testimony of each person who handled the specimen or its container. The state need only show that the specimen remained in an unchanged condition from the time it was withdrawn until it was analyzed. This may be done by showing that the container and its label and seal were in the same condition at both times." *Cleveland v. Harmon* (Nov. 24, 1993), Cuyahoga App. No. 64139, unreported, 1993 WL 489752.

█ In the instant case, R.N. Veneatra Dambreville, who drew the blood, recorded on the sealed container the name of the patient and the date and time the sample was taken. The sample was sent by vacuum tube to the lab, where it arrived in fifteen to twenty seconds. In the instant case, the test results were returned in thirty-nine minutes. The test sample was logged into the hospital computer at the lab by technician Marilyn Lotarski. The sample was received in a sealed container in a plastic bag with the defendant's name on the sample.

█ The city has met its initial burden of establishing that it is reasonably certain that no substitution, alteration, or tampering took place. *State v. Moore* (1973), 47 Ohio App.2d 181, 1 O.O.3d 267, 353 N.E.2d 866, The issue of whether there exists a break in the chain of custody is a determination belonging to the trier of fact. *Columbus v. Marks* (1963), 118 Ohio App. 359, 25 O.O.2d 228, 194 N.E.2d 791,

█ *This court holds that a blood sample, marked and recorded with substantial evidence that it remained in an unchanged condition from the time it was drawn to the time it was analyzed, is admissible for purposes of Ohio Adm.Code 3701–53–06(A), despite the fact the tracking system was computer-based and did not reflect every possible party that might handle the individual sample.*

### The Preservation-of-the-Sample Issue

█ The defendant's claim that the failure of the hospital to preserve the sample for one year in violation of Ohio Adm.Code 3701–53–06(A) is also without merit. It is clear the hospital did not save the sample for one year as outlined under the ODH guidelines. Technician Lotarski testified that the sample was sealed and kept for one week then discarded as a biohazardous waste. The sample would be preserved longer only if there was a call to preserve the sample. In the instant case, the defendant was being treated by the hospital for medical purposes. As part of this treatment, the blood was drawn and the sample was

available to him for one week after the test. The sample was destroyed in the regular course of business.

The United States Supreme Court in *California v. Trombetta* (1984), 467 U.S. 479, 491, 104 S.Ct. 2528, 2535, 81 L.Ed.2d 413, 423, held: "[T]he Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce breath-analysis test at trial." "The court analyzed the issue in terms of fundamental fairness and the criminal defendant's right to present a complete defense by access to evidence of an exculpatory nature in the hands of the prosecution." *State v. Purdon* (1985), 24 Ohio App.3d 217, 219, 24 OBR 395, 396, 494 N.E.2d 1154, 1156. "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs* 427 U.S. [97] 109–110 [96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353–354] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (Footnote omitted.) *Trombetta*, 467 U.S. at 488–489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.

The hospital was a medical facility involved in the treatment of patients. It was not designed to be an Ohio Department of Health or police agency testing site. It apparently followed acceptable standards in the medical profession for biohazardous waste. The defendant had an opportunity to preserve the sample for additional testing. There is nothing in the record indicating that the sample had any exculpatory value. The defendant failed to request additional testing and thus no due process violation occurred. *State v. Watson* (1975), 48 Ohio App.2d 110, 2 O.O.3d 79, 355 N.E.2d 883.

██ *This court holds that the failure to preserve a blood sample consistent with Ohio Adm.Code 3701–53–06(A) will not invalidate the test result where there is no evidence the sample was exculpatory, the defendant had knowledge of its existence, and had a reasonable opportunity to preserve the sample.*

██ For the above reasons, this court holds that the blood test results are in *substantial compliance* with the ODH guidelines and may be admitted as evidence, with proper supporting testimony, that may be used towards supporting by weight of evidence a claim of intoxication as provided in an R.C. 4511.19(A)(1) prosecution, but not for a prosecution under the legal presumption of intoxication.

## THE PATIENT–PHYSICIAN PRIVILEGE

The defense argues that hospital personnel should be precluded from testifying about the defendant's condition at the hospital under the patient-physician

privilege as outlined in R.C. 2317.02. The city argues that the privilege does not apply because the defendant was not cooperative in his treatment and the medical personnel who treated him were not physicians under the statute, and, therefore, the statute does not apply.

The patient-physician privilege first surfaced in the English courts in 1776. Wade, The Ohio Physician Patient Privilege: Modified, Revised, and Defined (1989), Ohio St.L.J. 1147. The privilege was designed to protect communications between a patient and a physician to ensure that the conversations would not become public. *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548,

The Ohio privilege is stated in R.C. 2317.02. It states:

"The following persons shall not testify in certain respects:

" * * *

"(B)(1) A physician or a dentist concerning a communication made by a patient in that relation or the physician's or dentist's advice to a patient, except as otherwise provided in this division, division (B)(2), and division (B)(3) of this section, and except that, if the patient is deemed by section 2151.421 of the Revised Code to have waived any testimonial privilege under this division, the physician may be compelled to testify on the same subject.

"The testimonial privilege under this division does not apply and a physician or dentist may testify or may be compelled to testify in any of the following circumstances:

" * * *

"(b) In any criminal action concerning any test or the results of any test that determines the presence or concentration of alcohol, a drug of abuse, or alcohol and a drug of abuse in the patients blood, breath, urine or other bodily substance at any time relevant to the criminal offense in question."

It is important to note the city is seeking to remove the privilege in order to introduce evidence of the defendant's intoxication *beyond the simple lab result* defined under R.C. 2317.02(B)(1)(b). It seeks to admit the observations of the medical personnel and the communications of the defendant showing his level of intoxication. These observations and communications are contained in the three pages of nurse's notes marked into evidence in the motion-to-suppress hearing.

For years, Ohio case law carved out a public policy exception to the privilege, holding that the public interest in the prosecution of DUI cases outweighed any patient claim of privilege relative to blood-alcohol test results. See Ohio Driving Under the Influence Law (1998) Judge Mark P. Painter, Section 13.6; *State v. Boysaw* (1987), 40 Ohio App.3d 173, 532 N.E.2d 154; *State v. Kavlich* (1986), 33

Ohio App.3d 240, 515 N.E.2d 652; *State v. Tu* (1984), 17 Ohio App.3d 159, 17 OBR 291, 478 N.E.2d 830; *State v. Dress, supra.*

The Ohio Supreme Court ended judicial interpretation of the statute with *State v. Smorgala* (1990), 50 Ohio St.3d 222, 553 N.E.2d 672. *Smorgala* held that courts could not override a legislatively created privilege by enacting a judicial policy exception in DUI cases. Ohio Driving Under the Influence Law (1998), *supra.* In 1993, the legislature reacted to *Smorgala* by enacting R.C. 2317.02(B)(1)(b). The statute removed the privilege as it pertains to alcohol and or drug tests in criminal actions. See Ohio Driving under the Influence Law, *supra.*

The issue, however, from the city's perspective, is whether the privilege should even apply in a case where the patient does not voluntarily seek or cooperate in the treatment, and the treatment is made to medical personnel not expressly named in the statute.

In the instant case, the defendant fought with the nursing staff during his initial diagnosis and treatment to the point that security officers were called and the defendant had to be placed in four-point restraints in the emergency room. His primary care giver was R.N. Veneatra Dambreville, not a physician for purposes of R.C. 2317.02.

The city relies on *State v. Conley* (Aug. 22, 1996), Cuyahoga App. unreported, 1996 WL 476438. No. 69597, *Conley* affirmed the admissibility of a gonorrhea test result into evidence in a rape case. The appellate court held that the patient-physician privilege does not attach when the visit is not voluntary and the physician does not examine or treat the patient to alleviate medical complaints. See *Conley, supra.* The court in *Conley* cited *In re Winstead* (1980), 67 Ohio App.2d 111, 21 O.O.3d 422, 425 N.E.2d 943, which held:

"The crucial prerequisite for the creation of the privilege is the voluntary consultation by the patient. This must be present to create the privilege in the patient, for if the patient is not voluntarily seeking help, then the underlying rationale for the privilege is not present, *i.e.,* the promotion of free and full discourse between physician and patient." *Id.* at 115, 21 O.O.3d at 425, 425 N.E.2d at 945.

*In re Winstead* involved an involuntary commitment proceeding. *Conley* involved lab testing as a result of a child sexual abuse allegation. See *Conley, supra.* It is unknown whether the district court of appeals would extend the holdings of the above two cases to areas beyond the blood test results in DUI cases in light of the limitations placed on the admission of evidence other than the blood result by *Smorgala,* and R.C. 2317.02(B)(1)(b).

In the present case, the issue of the defendant's failure to voluntarily participate in treatment must be viewed in the context that he was taken to the hospital against his will by police in handcuffs. His resistance to treatment must be evaluated with the continuing resistance he showed to law enforcement officers prior to his arrival. There was no indication he was taken through an admitting process before treatment. It is also clear that the officers took him to the hospital for diagnosis and treatment. Nothing in the record indicates that the defendant was shown or asked to sign any admission form or treatment form upon his arrival.

 This court would hold, when considering the historical purpose of the privilege, that where diagnosis and treatment are not voluntarily sought, the privilege should not apply. However, under the present facts in this case, it is the police who initiated the defendant's contact with the hospital. *It is difficult to have one party seek diagnosis and treatment for a person and then have that same party seek to remove the privilege that the very diagnosis and treatment create under R.C. 2317.02.* It is equally clear that in this case there is no evidence, if the privilege does exist, that the defendant intended to waive it under any of the exceptions. See R.C. 2317.02 and *Smorgala, supra.* Note that in *Conley,* the defendant failed to preserve the apparent error in admitting privileged communications, relying on an initial motion *in limine* as a final ruling when in fact it was only preliminary or interlocutory. See, also, *State v. Grubb* (1986), 28 Ohio St.3d 199, 28 OBR 285, 503 N.E.2d 142.

Based on the above factors, this court finds that where voluntary consultation does not exist there is no privilege concerning evidence of defendant's intoxication in a DUI case. However, where, as in this case, the very party seeking to remove the privilege is the party responsible for the initiation of the diagnosis and treatment, the privilege applies in all matters, excepting the blood test results specifically exempted by R.C. 2317.02(B)(1)(b). Thus, the privilege applies to observations and communications made and memorialized in the hospital record by R.N. Dambreville involving the defendant's diagnosis and treatment.

 This court notes that the defendant did utilize a portion of the nurse's notes to introduce a statement that the defendant was "somewhat cooperative" during the third hour of his treatment. This in fact would constitute a waiver of the privilege. Admission of a physician's report waives the physician patient privilege. *Long v. Isakov* (1989), 58 Ohio App.3d 46, 568 N.E.2d 707, See also, *York v. Roberts* (1983), 9 Ohio Misc.2d 19, 9 OBR 621, 460 N.E.2d 326, and *Mann v. Univ. of Cincinnati* (S.D. Ohio 1993), 824 F.Supp. 1190. In the event the defendant offers these records at trial, this waiver would apply.

■ The city also claims that the primary nurse, Venetra Dambreville, and the security guard, James Hastings, were not "physicians" as outlined under the statute. See R.C. 2317.02. Since the privilege is in derogation of the common law, it must be strictly construed. *Weis v. Weis* (1947), 147 Ohio St. 416, 34 O.O. 350, 72 N.E.2d 245,

■ Clearly, R.N. Dambreville and security guard Hastings are not physicians. A strict reading would appear to automatically eliminate them from the statute. This was part of the logic in *Weis*. *Weis* is still proper law, fifty years later, but it is important to recognize historical distinctions. In *Weis*, the nurses who were excluded from the privilege were *unregistered* nurses called to testify in a will contest case. In the instant case, R.N. Dambreville was a highly trained professional. Her observations were recorded in the medical record and apparently used by the physician in diagnosing and treating the patient. Furthermore, R.N. Dambreville said that her personal observations of the defendant, (*e.g.*, his alleged level of intoxication), went "hand in hand" with her observations regarding his treatment.

Recent appellate decisions have interpreted the language of the statute to include certain information acquired by a nurse in the performance of her duties, if the acquisition was intended to assist the physician in the treatment or diagnosis of the patient, as being protected by the privilege. See *Johnston v. Miami Valley Hosp.* (1989), 61 Ohio App.3d 81, 572 N.E.2d 169, and *State v. Kabeller* (1990), Franklin App. No. 90AP-53, unreported, 1990 WL 210736.

Thus, R.N. Dambreville and other medical professionals are precluded from testifying about their observations and communications of the defendant related to his diagnosis and treatment unless the defendant waives the privilege or opens the door to admission of testimony about his condition.

■ This, however, does not include the security staff who are not medical professionals as outlined under the statute and thus not part of those covered under the privilege. They can testify about any observations they made not related to diagnosis and treatment. The actions of security guards are for purposes of security, not diagnosis and treatment. While their presence may ultimately enable the medical professional to diagnose and treat, they are not the parties providing that treatment or interacting with the patient for purposes of that treatment. See *Smorgala, supra,* and *State v. Cherukuri* (1992), 79 Ohio App.3d 228, 607 N.E.2d 56, for a discussion on observations not related to medical treatment.

*This court holds that P.H.S. Mt. Sinai's motion to quash the trial subpoenas of hospital staff is overruled, provided the testimony sought is consistent with this opinion.*

## THE DEFENDANT'S STATEMENTS

In this case, the defendant is alleged to have made a number of statements to police officers (1) at the initial scene, (2) in the patrol cruiser on the way to the Bratenahl police station, (3) at the Bratenahl station, (4) at the hospital, and (5) when leaving the hospital. The defense claims that these statements were made in an environment where the requirements of *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, should have been in place and the police failed to give meaningful *Miranda* warnings.

In the present case, Officer Tom Marazzi approached the defendant at the scene. Marazzi said that the defendant started yelling obscenities at him. The defendant told the police officer that he was on the phone to his lawyer and that he did not have to talk to police. The defendant was told that he was under arrest and was handcuffed. The defendant continued to use obscenities with the officer. At this time, the officer advised him of his *Miranda* rights.

Officer Mike Ward transported the defendant to the Bratenahl police station from the scene of the accident. Ward said that he also read the defendant his *Miranda* warnings. Ward thought that he had referred to the *Miranda* warnings in his report, but later admitted after reviewing the report that he had not. Ward then produced a written statement he gave to a superior officer twelve to eighteen hours after the incident indicating that he gave the *Miranda* warnings. Ward said that the defendant was not given a written waiver form. Officer Ward related that in the four years he has been on the police force he has never used a written *Miranda* waiver form. He reported that *Miranda* warnings are normally documented in the police report.

The defendant's alleged conduct while in the custody of Officer Ward and fellow Officer Bartos was similar to that of Officer Marazzi. Both officers claimed that the defendant used a stream of profanities and was generally uncooperative.

Officer Bartos indicted that after leaving the hospital several hours after the accident he again *"Mirandized"* the defendant and the defendant then said that he was sorry and did not remember what had happened.

*Miranda* requires two conditions to be present for its requirements to be in place: (1) custody and (2) police interrogation. *Miranda* is generally inapplicable to roadside questioning where a person is briefly and temporarily stopped for a traffic infraction even when a defendant is placed in the rear of a patrol car. See *State v. Warrell* (1987), 41 Ohio App.3d 286, 534 N.E.2d 1237, Volunteered statements are also not covered by *Miranda*. See *State v. Roe* (1989), 41 Ohio St.3d 18, 535 N.E.2d 1351.

■ In the instant case, it is clear from the record that the police never had the opportunity to initiate custodial interrogation. The defendant's comments were not in response to any police questioning. The comments are not even phrased in answer-like form. The statements are laced with profanity and not responsive to any apparent inquiry. At the only point where police were apparently prepared to formally question the defendant at the station, a scuffle ensued and the defendant was injured, resulting in the police transporting him for medical treatment at the hospital.

*This court holds that proper Miranda warnings render statements admissible even when subjected to custodial interrogation. Voluntary statements made in custody without police interrogation are admissible regardless of whether law enforcement officers give proper Miranda warnings.*

The defendant was *"Mirandized"* on at least three occasions by Officers Marazzi, Ward, and Bartos. While in custody, he made voluntary statements to police, which reflected his apparent level of intoxication. These statements were not made in response to police interrogation. For these reasons, the defendant's motion to suppress the statements is denied.

*Judgment accordingly.*