OPINION
{¶ 1} On August 20, 2003, Christy S. Wells pled no contest to aggravated vehicular homicide and to vehicular assault due to a previous ruling by the Greene County Court of Common Pleas overruling her motion to suppress. The court found her guilty and sentenced her to eight years of imprisonment, five years of which were mandatory, on the aggravated vehicular homicide charge and to four years of incarceration on the vehicular assault charge, to be served concurrently. Wells appeals from the denial of her motion to suppress.
 {¶ 2} According to the state, on November 17, 2001, Wells ran a red light at the intersection of Factory Road and U.S. Route 35 in Beavercreek, Ohio, while traveling westbound on U.S. Route 35. Consequently, Wells' vehicle collided with a Honda driven by Mary Greene. The front half of the Honda hit an automobile driven by James Carson, who was traveling eastbound on U.S. Route 35. As a result of the accident, Greene was killed, and Carson suffered severe pain in his wrist.
 {¶ 3} After the accident, Wells was transported to Miami Valley Hospital by emergency medical technicians from the Beavercreek Fire Department. Doctors at the hospital treated Wells as a trauma patient. Per routine procedure with trauma patients, Kristine Kolker, a phlebotomist with Compunet Clinical Laboratories ("Compunet"), the medical laboratory for the hospital, drew blood from Wells. The blood was tested by Sharon Kirchner, a Compunet employee. The alcohol level in her blood plasma was .121 and her whole blood conversion was .110. Approximately two hours later, additional blood was drawn by the Beavercreek Police Department, with Wells' consent, and it was tested by the Miami Valley Regional Crime Laboratory. The result of this sample was .060. Wells was arrested by Officer Molnar at Miami Valley Hospital and taken to the police station.
 {¶ 4} On November 30, 2001, Wells was indicted for one count of aggravated vehicular homicide, in violation of R.C.2903.06(A)(1), a felony of the first degree, or, alternatively, reckless homicide, in violation of R.C. 2903.041(A), a felony of the third degree ("Count One"), and one count of aggravated vehicular assault, in violation of R.C. 2903.08(A)(2), a felony of the third degree ("Count Two"). In its second Bill of Particulars, the state limited Count One to aggravated vehicular homicide, in violation of R.C. 2903.06(A)(1), as a proximate result of a violation of R.C. 4511.19(A)(1) (Doc. #94). On February 26, 2002, Wells filed a motion to suppress her statements to the police (Doc. #57). The court held hearings on that motion on March 29 and April 2, 2002. Wells also filed a motion to suppress both of the blood samples, arguing that the first blood sample did not comply with Ohio Admin. Code Chapter 3701-53 in that the sample was not properly collected, it was retained for no more than five days, the laboratory did not follow required procedures, and chain of custody procedures were not followed (Doc. #76, Doc. #93, Doc. #114). As to the second sample, Wells argued that the sample was taken more than two hours after the accident, contrary to R.C. 4511.19(D)(1). On May 1 and May 8, 2002, the court held additional hearings on Wells' second suppression motion.
 {¶ 5} On July 19, 2002, the trial court overruled both motions to suppress. With regard to the first blood sample, the court concluded that an anticoagulant had been used in the testing of Wells' blood and that, regardless, the results were still admissible "so long as the procedures are reliable and the person doing the testing had sufficient training and skill to qualify her in that regard." Citing Kolker's qualifications and Compunet's certification by the College of American Pathologists and by the Health Care Financing Administration of the Department of Health and Human Services, the court concluded that the testing had been reliable and the person performing the test was qualified. As for the chain of custody issue, the court found no break in the chain of custody from the time Wells' blood was drawn through the time it was tested by Sharon Kirchner. The court further held that the failure to retain the sample for a one-year period did not render the test result inadmissible, because the disposal did not violate the Due Process Clause. Following Cleveland v. Haffey, 94 Ohio Misc.2d 79, 89-90,703 N.E.2d 380 (Ohio Mun. 1998), the court held that the results were admissible, because Wells had knowledge of the sample's existence, she had an opportunity to preserve the sample, and there was no evidence that the sample was exculpatory. The court therefore ruled that the first blood sample was admissible. As for the second blood sample, the trial court stated that the two-hour requirement for the collection of blood and urine specimens did not apply to aggravated vehicular homicide prosecutions and that any defects in the testing affected the weight of the evidence, not its admissibility.
 {¶ 6} On August 23, 2002, Wells entered guilty pleas in accordance with North Carolina v. Alford (1970), 400 U.S. 25,91 S.Ct. 160, 27 L.Ed.2d 162. Wells appealed her conviction, and we affirmed on May 9, 2003. On August 20, 2003, by agreement of the parties and with court approval, Well's Alford plea was vacated, and she entered a plea of no contest. The court reimposed its earlier sentences. This appeal followed. On appeal, Wells asserts one assignment of error:
 {¶ 7} "The trial court committed prejudicial error by overruling appellant's motion to suppress the results of a blood sample which was collected and maintained in blatant violation of rule of evidence 702(c) and many regulations of the Ohio department of health."
 {¶ 8} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. State v. Mills
(1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v.Fanning (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. State v. McNamara (1997), 124 Ohio App.3d 706,707 N.E.2d 539." State v. Burnside, 100 Ohio St.3d 152, 154-55,2003-Ohio-5372, 797 N.E.2d 71.
 {¶ 9} R.C. 4511.19(A) prohibits adults from driving while under the influence of alcohol or drugs or with a prohibited level of alcohol in certain bodily substances. See State v.Mayl, 154 Ohio App.3d 717, 2003-Ohio-5097, 798 N.E.2d 1101. Pertinent to this case, section 4511.19(A)(1) proscribes driving under the influence generally, while section 4511.19(A)(2) prohibits driving with a specified concentration of alcohol in the person's blood. R.C. 2903.06(A)(1), which defines aggravated vehicular homicide, states that no person shall cause the death of another "as a proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance."
 {¶ 10} As articulated by the Supreme Court of Ohio,
 {¶ 11} "The General Assembly established the threshold criteria for the admissibility of alcohol-test results in prosecutions for driving under the influence and driving with a prohibited concentration of alcohol in R.C. 4511.19(D). That section, which governs the admissibility of alcohol-test results, provides that a defendant's blood, breath, or urine `shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director of health pursuant to section 3701.143 of the Revised Code.'" Burnside, 100 Ohio St.3d at 155. In accordance with R.C. 3701.143, the Director of the Ohio Department of Health ("ODH") has promulgated regulations which set forth the qualifications for laboratories and personnel who may test blood and urine for alcohol, as well as the techniques or methods for chemically analyzing "blood, urine, breath, or other bodily substance in order to ascertain the amount of alcohol, a drug of abuse, or alcohol and a drug of abuse" therein. See Ohio Admin. Code 3701-53-01 et seq.
 {¶ 12} In Burnside, the Supreme Court of Ohio reiterated that strict compliance with the ODH regulations is not required for blood results to be admissible. 100 Ohio St.3d at 159, citingState v. Plummer (1986), 22 Ohio St.3d 292, 490 N.E.2d 902. However, the court has limited the substantial compliance standard "to excusing only errors that are clearly de minimus," meaning those errors which are "minor procedural deviations." Id. The supreme court emphasized that the criterion for admissibility under R.C. 4911.19 is compliance with the regulations, not a judicial determination that the alcohol test results are reliable. Id. at 158. It explained:
 {¶ 13} "A court infringes upon the authority of the Director of Health when it holds that the state need not do that which the director has required. Such an infringement places the court in the position of the Director of Health for the precise purpose of second-guessing whether the regulation with which the state has not complied is necessary to ensure the reliability of the alcohol-test results." Id. at 159.
 {¶ 14} We have recently held that the statutory-based requirements for admissibility of evidence used to prove a violation of R.C. 4511.19(A) generally apply to prosecutions for aggravated vehicular homicide, in violation of R.C.2903.06(A)(1). State v. Mayl, supra.
 {¶ 15} Wells claims that the trial court erred in overruling her motion to suppress the first blood sample taken by Kristine Kolker, a Compunet employee, and analyzed by Compunet at Miami Valley Hospital. She asserts that the procedures deviated from ODH regulations in five respects: (1) the blood sample was not collected with an anticoagulant, (2) the state failed to maintain the chain of custody for the sample; (3) the state failed to refrigerate the blood sample properly; (4) the blood sample was not analyzed by a person or facility qualified by the Ohio Department of Health, (5) the blood sample was not retained for a one-year period. Each will be addressed in turn.
A. Use of an Anticoagulant
 {¶ 16} Ohio Admin. Code 3701-53-05(C) provides that "[b]lood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested." "This language does notadvise the use of a solid anticoagulant when drawing a blood sample; it demands it." (emphasis sic.) Burnside,100 Ohio St.3d at 159. The failure to use an anticoagulant renders the blood analysis results inadmissible for lack of substantial compliance with the ODH regulations. Id. at 160.
 {¶ 17} In support of her assertion that an anticoagulant was not used and, instead, that a gel coagulant was in the vacuum container, Wells cites to the following exchange between defense counsel and Kolker:
 {¶ 18} "Q: And what's in this vacuum tube? Was there an anticoagulant?
 {¶ 19} "A: We just recently changed tubes. To tell you the truth, I'm almost positive it would be an SST separator tube. That has a gel in it that separates the serum from the cells.
 {¶ 20} "Q: A gel. Do you know if you were employing a gel at the time on November 17th?
 {¶ 21} "A: Correct.
 {¶ 22} "Q: You were using a gel then?
 {¶ 23} "A: I'm almost positive, yes.
 {¶ 24} "Q: It was not a powder?
 {¶ 25} "A: A powder?
 {¶ 26} "Q: Mmm-hmm.
 {¶ 27} "A: There is a little bit of power that helps it clot, but I could not tell you specifically what that powder is in the tube.
 {¶ 28} "Q: So the purpose of the powder is to clot?
 {¶ 29} "A: Correct. So you then can spin it." (T.II at 26-27).
 {¶ 30} Based on this testimony, Wells apparently contends that the trial court should have found that a gel coagulant was used rather than a solid anticoagulant, and that the collection procedure did not substantially comply with ODH requirements.
 {¶ 31} The state responds that Kolker's testimony, read together with that of Dr. Daniel Hood, Medical Director of Compunet, demonstrates that a solid anticoagulant was used in the first blood. Hood testified that Compunet performs an enzymatic assay on either plasma or serum to test for the amount of alcohol in the blood. He stated that when blood is drawn for alcohol testing, the patient's arm is swabbed with a Betadine swab, which does not contain any type of alcohol, and the blood is collected into a vacuum container. He stated that the vacuum container contains a Lithium-Heparin, which is a solid anticoagulant. The state notes that Kolker also testified that a powder was in the tube, and that specific tubes were used for blood samples that were drawn for the purpose of blood alcohol testing.
 {¶ 32} Reading Kolker's and Hood's testimony together, the trial court did not abuse its discretion in concluding that an anticoagulant was present in the vacuum tube used by Kolker. The trial court was presented with competent, credible evidence in the form of Hood's testimony that the tubes used for blood alcohol testing contained a solid anticoagulant. Although Kolker's testimony contained evidence that both an anticoagulant and a coagulant might have been used, the trial court was free to conclude, in light of Hood's testimony, that the tube contained an anticoagulant, as required by the Ohio Administrative Code. Because the trial court could have reasonably concluded (and did, in fact, conclude) that a solid anticoagulant was used in the vacuum container, the collection procedure did not deviate from the requirements of Ohio Admin. Code 3701-53-05.
B. Chain of Custody
 {¶ 33} Wells asserts that the state did not establish a complete chain of custody for the first blood sample taken by Kolker. Ohio Admin. Code 3701-53-05(E) requires that containers with blood or urine samples be sealed such that tampering can be detected, and that they have a label indicating (1) the "name of suspect," (2) the date and time of collection, and (3) the name or initials of the person collecting and/or sealing the sample.
 {¶ 34} Wood testified that the patient's name, the patient's hospital identification number, and the date and time of collection are placed on the vacuum tube at the time the blood is collected. Kolker testified that she places her initials on the tube when she collects the blood sample. In addition, Wood indicated that this information was kept on a separate record. Kolker testified that once the sample is taken, the sample is sent through the "tube system" to the laboratory, where it is tested. Sharon Kirchner testified that she began testing the sample as soon as it arrived through the pneumatic tube system. We agree with the trial court that there was no break in the chain of custody from the time the blood sample was taken until it was tested by Compunet.
C. Refrigeration of the Blood Sample
 {¶ 35} Wells claims that the second blood sample, drawn at Miami Valley Hospital at the request of the Beavercreek Police Department, was not properly refrigerated. Specifically, she cites to the testimony of Officer Brian Burkett, in which he stated that during the twenty minutes that it took to transport the blood sample to the Miami Valley Regional Crime Lab, the sample was not refrigerated. We note that Wells did not raise the issue of lack of refrigeration with the trial court (see Doc. #114), and that she has not challenged on appeal the trial court's ruling admitting the second blood sample. Accordingly, she has waived any appeal of this matter. We note, parenthetically, however, that Ohio Admin. Code 3701-53-05 does not require refrigeration while "in transit."
D. ODH Qualification
 {¶ 36} Wells argues that Compunet was not a laboratory licensed by the Ohio Department of Health and, thus, the results of its blood alcohol analysis must be inadmissible under R.C.4511.19(D) and Ohio Admin. Code 3701-53-09. The state responds that a properly administered, medically recognized blood test performed and analyzed by Compunet professionals is admissible in a prosecution under R.C. 4511.19(A)(1), despite the absence of ODH permits. It asserts that the lack of a permit issued by ODH goes only to the weight of the test results, not to its admissibility.
 {¶ 37} The state cites to several cases, arguing that the lack of an ODH permit does not render the alcohol test results inadmissible, because the hospital procedures substantially complied with ODH regulations. In State v. Herrig (Apr. 16, 1999), Wood App. No. WD-98-047, the defendant moved to suppress the results of a blood test ordered by an emergency room doctor for treatment purposes. The Sixth District Court of Appeals stated that "test results may be admissible even when the technician who analyzes a blood sample does not hold a valid permit from the Ohio Department of Health." Id., citing State v.Dress (1982), 10 Ohio App.3d 258, 263, 461 N.E.2d 1312. It further stated that the lack of a permit went to the weight of the evidence, not its admissibility. Reviewing the evidence from the suppression hearing, the court of appeals found no evidence to suggest that the hospital blood test did not substantially comply with the methods approved by the director of health.
 {¶ 38} In State v. Quinones, the Ninth District Court of Appeals also concluded that medical blood tests were admissible, despite the fact that the laboratory did not have an ODH permit. The appellate court concluded that R.C. 2317.02, the physician-patient privilege statute, "clearly envisions the admissibility of all probative medical tests in criminal prosecutions." The court noted that R.C. 2317.02(B)(1)(b) specifically excludes from physician-patient privilege testimony "in any criminal action concerning any test or the results of any test that determines the presence or concentration of alcohol * * * in the patient's blood * * *." The court further noted that the results of properly administered blood tests may be admitted into evidence, despite a lack of literal compliance with R.C. 4511.19
for violations of R.C. 4511.19(A)(1). Id., citing City of Newarkv. Lucas (1988), 40 Ohio St.3d 100, 102, 532 N.E.2d 130. It thus concluded that "[b]ecause neither R.C. 2903.06 nor R.C.4511.19(A)(1) require that a medical test be conducted in accordance with R.C. 4511.19 and 3701.143, or with rules promulgated thereunder, in order to be admissible as evidence, and because there was sufficient evidence that the medical test was properly conducted, we do not find that the trial court erred in failing to suppress medical test evidence."
 {¶ 39} In the present case, Hood testified that Compunet is certified by the College of American Pathologists ("CAP"), the major inspection organization for clinical laboratories in the United States. He indicated that certification requires participation in blind studies for testing unknown samples and undergoing a thorough external inspection every two years. In addition, Hood testified that Compunet has participated in continuing serum, alcohol and volative survey compliance evaluations by CAP, and that it has successfully produced correct results in every survey. Hood indicated that Compunet has not filed for ODH certification but that it meets the substantial requirements for that certification. Sharon Kirchner testified that she has a Bachelor of Science degree in medical technology from Ohio State University, and that she has been registered by the American Society of Clinical Pathologists. She indicated that she has worked in her field for twenty-seven years, ten years of which she has worked for Compunet.
 {¶ 40} Using the standard of substantial compliance as set forth in Burnside, we cannot conclude that Compunet and Kirchner have substantially complied with the permit requirements of Ohio Admin. Code Chapter 3701-53. As indicated by Hood, Compunet's employees do not have ODH permits, the lab does not maintain a copy of Ohio Admin. Code Chapter 3701-53, and it has not incorporated the ODH regulations into its procedure manual.
 {¶ 41} Although Compunet does not substantially comply with ODH regulations, we agree with the state the Wells' blood test results are still admissible in the context of a R.C.4511.19(A)(1) violation, provided that the test was properly administered (i.e., the test itself substantially complied with ODH regulations) and the test result is presented with expert testimony. In City of Newark v. Lucas, supra, the Supreme Court of Ohio differentiated between per se violations under R.C.4511.19(A)(2)-(5) and violations under R.C. 4511.19(A)(1) (driving under the influence). The court noted that "[i]n determining whether one of these per se offenses was committed by the defendant, the trier of fact is not required to find that the defendant operated a vehicle while under the influence of alcohol or drugs, but only that the defendant operated a vehicle within the state and that the defendant's chemical test reading was at the proscribed level. The critical issue at trial is the accuracy of the test, not the behavior of the accused." Newark,40 Ohio St.3d at 103. Reasoning that it would defeat the legislative intent and produce confusing, unreliable and inconsistent verdicts if test results from bodily substances withdrawn beyond the two-hour limit were admissible in prosecutions for per se violations, the supreme court held that "the results of a properly administered bodily substances test may be admitted in evidence only if the bodily substance is withdrawn within two hours of the time of the alleged violation." Id. at 104.
 {¶ 42} Turning to R.C. 4511.19(A)(1) violations, the supreme court stated that "the amount of alcohol found as a result of the chemical testing of bodily substances is only of secondary interest. The defendant's ability to perceive, make judgments, coordinate movements, and safely operate a vehicle is at issue in the prosecution of a defendant under such section. It is the behavior of the defendant which is the crucial issue. The accuracy of the test is not the critical issue as it is in prosecutions for per se violations." Id. Because the test is neither dispositive of the violation nor has presumptive weight, the court concluded that, for R.C. 4511.19(A)(1) violations, "the results of a properly administered bodily substances test presented with expert testimony may be admitted in evidence despite the fact that the bodily substance was withdrawn more than two hours from the time of the alleged violation." Id. at paragraph two of the syllabus.
 {¶ 43} In our judgment, the same approach applies to blood test results that fail to comply with ODH regulations regarding violations of R.C. 4511.19(A). Whereas the failure to comply with Ohio Admin. Code Chapter 3701-53 precludes the admission of test results for per se violations of R.C. 4511.19(A), such deficiencies do not necessarily render the results inadmissible for violations of R.C. 4511.19(A)(1). As in Newark, in a subsection (A)(1) prosecution, the trial court should be able to admit a properly administered chemical test analysis, even one that was performed by a laboratory that does not comply with ODH regulations, if presented with expert testimony.
We note that our ruling herein does not conflict with our recent holding in Mayl, supra. In Mayl, the defendant was indicted for aggravated vehicular homicide based on a violation of R.C. 4511.19(A). The indictment did not specify whether the state was relying upon R.C. 4511.19(A)(1) or a per se violation of that statute. Mayl challenged the admissibility of blood drawn by hospital personnel as part of their trauma protocol, on the ground that the blood was not analyzed in substantial compliance with ODH regulations. The state responded that under our decision in State v. Davis (1983), 13 Ohio App.3d 265, 469 N.E.2d 83, the requirements of R.C. 4511.19(D) were inapplicable to aggravated vehicular homicide prosecutions. We held that the trial court improperly denied Mayl's motion to suppress the blood test results, holding generally that "the testing requirements of R.C. 4511.19(D)(1) and Ohio Admin. Code 3701-53-01 et seq. apply to prosecutions for violations of R.C. 2903.06(A)(1) with respect to admissibility of evidence of the results of tests of a defendant's blood, blood serum or plasma, breath, urine, or other bodily substance when that evidence is offered to show alcohol level or content." Mayl, 154 Oho App.3d at 724. Although the decision discussed differences of opinion regarding the applicability of the requirements of R.C. 4511.19(D)(1) and the ODH regulations to 4511.19(A)(1) violations[1] and indicated that, on its face, R.C. 4511.19(D)(1) does not distinguish between (A)(1) violations and per se violations, we expressly stated that "[w]e are not required to resolve those issues." Id. at 723. Instead, because the state had claimed that Mayl's aggravated vehicular homicide charge was based on a violation of R.C. 4511.19(A) generally and thus it could have proceeded at trial under a per se theory, we concluded that the state had "the burden to show that the test-result evidence does not suffer from the defects alleged in Mayl's motion." To the extent that Mayl suggested that the statutory and regulatory requirements specifically applied to R.C. 4511.19(A)(1) violations, that suggestion was dicta.
 {¶ 44} Turning to the case before us, the record supports the conclusions that Compunet drew Wells' blood with a non-alcohol antiseptic into a vacuum tube with a solid anticoagulent, as required by Ohio Admin. Code 3701-53-05, and performed an enzymatic assay to test Wells' blood, which was an approved method under the ODH regulations. Accordingly, the evidence indicates that Wells' analysis was properly performed. In addition, in light of Hood and Kirchner's testimony, we have no doubt that Compunet and Kirchner were competent and qualified to perform chemical tests to determine the concentration of alcohol or drugs in Wells' blood. Although Hood and Kirchner did not have permits from ODH, both individuals met the educational and proficiency requirements to obtain permits under ODH regulations, and the laboratory was certified by CAP and had successfully undergone proficiency examinations. Accordingly, we find no fault in the trial court's determination that the admission of Compunet's analysis of Wells' blood in her R.C. 4511.19(A)(1) prosecution was not precluded by the lack of an ODH permit.
E. Sample Retention
 {¶ 45} Ohio Admin. Code 3701-53-06 requires laboratories to retain all positive plasma, serum, blood, and urine specimens "for a period of not less than one year, after which time the specimens may be discarded unless otherwise directed in writing from a court to retain such specimen for a longer period." Wells asserts that the trial court erred in concluding that the failure to preserve the first blood sample for one year did not render the results of the analysis inadmissible. She states: "Perhaps most egregious and most `untenably legally incorrect' and most causative of a `denial of justice' is the trial court's conclusion that the State's failure to preserve the blood sample for more than five days does not deny `due process' and does satisfy OAC 3701-[53-06] which expressly requires that the sample be saved for one year."
 {¶ 46} In concluding that the disposal of Well's first blood sample did not render the results of Compunet's analysis inadmissible, the trial court relied upon Haffey, in which the defendant challenged the admissibility of blood drawn by hospital personnel for medical treatment. As in the instant case, the hospital had discarded the blood within one week in the ordinary course of business. Evaluating whether the failure to preserve the sample constituted a due process violation, the Haffey
court held that "the failure to preserve a blood sample consistent with Ohio Adm. Code 3701-53-06(A) will not invalidate the test result where there is no evidence the sample was exculpatory, the defendant had knowledge of its existence, and had a reasonable opportunity to preserve the sample."74 Ohio Misc.2d at 92 (emphasis omitted). In the case before it, theHaffey court concluded that the failure to retain the blood sample did not violate due process, because the sample had been taken at a medical facility that was not designed to be an ODH or police agency testing site, the hospital had followed acceptable standards in the medical profession for biohazardous waste, the defendant had an opportunity to preserve the sample for additional testing, and there was nothing in the record indicating that the sample had had any exculpatory value. Moreover, the defendant had failed to request additional testing.
 {¶ 47} Wells asserts that the circumstances herein are distinguishable from Haffey. She notes that she had no legal representation until December 27, 2001, many days after the sample was destroyed. She emphasizes there is no evidence that she was advised that a vial of blood had been drawn and turned over to the police for alcohol testing or that the hospital intended to destroy the sample within three to five days. Wells thus argues that she did not have "a reasonable opportunity to preserve the sample." She further contends that the facts that Compunet was not licensed by the ODH and that there was conflicting evidence about whether an anticoagulant had been used raise suspicion about the reliability of the test results. Thus, she argues that the blood sample might have had some exculpatory value.
 {¶ 48} It is undisputed that Compunet did not substantially comply with the ODH requirement to maintain a positive blood specimen for a period of one year. See Burnside, supra. However, as with the lack of a permit, the failure to comply with ODH regulations does not necessarily render Wells' test results inadmissible in her R.C. 4511.19(A)(1) prosecution. State v.Rains (1999), 135 Ohio App.3d 547, 553, 735 N.E.2d 1. Because the test results have only secondary importance in an (A)(1) prosecution, we agree with the Haffey court that, in a prosecution under R.C. 4511.19(A)(1), the failure to preserve a blood sample consistent with Ohio Admin. Code 3701-53-06(A) will not invalidate the test result where the admission of that evidence comports with due process.[2] See id.
 {¶ 49} The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted where the state fails to preserve materially exculpatory evidence or destroys in bad faith potentially useful evidence. State v. Franklin, Montgomery App. No. 19041, 2002-Ohio-2370. To be materially exculpatory, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (quoting California v.Trombetta (1984), 467 U.S. 479, 489, 104 S.Ct. 2528,81 L.Ed.2d 413) (failure to preserve breath samples did not violate due process); Illinois v. Fisher (Feb. 23, 2004), 540 U.S. — . When evidence is only potentially exculpatory, the destruction of such evidence does not violate due process if the police act in good faith and the evidence is disposed of in accordance with normal procedures. Rains, 135 Ohio App.3d at 553, citing Arizona v.Youngblood (1988), 488 U.S. 51, 58, 109 S.Ct. 333,102 L.Ed.2d 281. In other words, when faced "with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," due process is violated only if the state acted in bad faith. Fisher, supra, citingYoungblood, 488 U.S. at 57.
 {¶ 50} In this case, Wells' first blood sample was potentially exculpatory. Certainly, there is at least a chance that further testing may have revealed a different blood-alcohol concentration. However, the blood sample was not exculpatory evidence, as that term is applied under Brady. Indeed, the hospital testing indicates that it was inculpatory. Kirchner testified that blood samples were normally destroyed within three to five days. Hood likewise indicated that blood samples were normally retained, on average, for three days. There is no evidence that Compunet acted outside of its normal procedures, nor is there evidence that the state acted in bad faith in permitting the destruction of such evidence. But see Rains,135 Ohio App.3d at 554 (ODH regulation on retention was "normal practice" in this state). Accordingly, the trial court properly concluded that the admission of Wells' first blood sample did not violate due process.
 {¶ 51} Although we find that the medical blood test at issue herein is admissible in Wells' aggravated vehicular homicide prosecution based on a R.C. 4511.19(A)(1) violation, we note that the results of this case may have been very different had the state proceeded based on R.C. 4511.19(A)(2), as its first amended bill of particulars alleged. As stated above, Ohio courts have held that where per se violations are concerned, blood-alcohol test results are admissible only where, at most, minor procedural deviations occur from ODH requirements. However, it is likely that in many aggravated vehicular homicide cases, the defendant's blood analysis will have been performed for treatment purposes at a medical institution with a clinical laboratory that was certified by CAP but not by the ODH.
 {¶ 52} Upon reviewing R.C. 4511.19 and the ODH regulations, it is unclear whether the Ohio legislature considered the fact that a number of blood samples would be drawn by qualified medical personnel and processed by qualified clinical laboratories solely for the purpose of medical treatment and not for the purpose of establishing alcohol levels for use in subsequent criminal prosecutions. A plain reading of R.C.4511.19(D) makes no distinction between bodily substances processed at clinical laboratories solely for medical purposes and those analyzed for law enforcement purposes. Rather, that statute requires that "[s]uch bodily substance * * * be analyzed * * * by an individual possessing a valid permit issued by the director of health pursuant to section 3701.143 of the Revised Code." According to the text of the statute, test results are admissible in prosecutions involving violations of R.C.4511.19(A) and (B) only if the bodily substance was withdrawn within two hours of the time of such alleged violation, the substance was analyzed in accordance with methods approved by the Director of Health, and the analyses was conducted by qualified individuals holding permits issued by the Director of Health pursuant to R.C. 3701.143. Burnside, 100 Ohio St.3d at 155;Cincinnati v. Sand (1975), 43 Ohio St.3d 79, 72 O.O.2d 44,330 N.E.2d 908, paragraph two of the syllabus; Newark, supra;State v. French (1996), 72 Ohio St.3d 446, 451-52,650 N.E.2d 887. In other words, neither the terms of R.C. 4511.19(D)(1) and R.C. 3701.143 nor the Supreme Court of Ohio's interpretation of those statutes exclude a blood analysis performed by hospital personnel for treatment purposes from the requirement to comply with the ODH regulations. Stated differently, the statute and regulations are not expressly limited to chemical analyses performed by laboratories at the request of law enforcement officers for law enforcement purposes.
 {¶ 53} We recognize that the Ohio legislature may have intended only to require ODH compliance from laboratories which perform chemical analyses at the request of law enforcement for law enforcement purposes. Although R.C. 4511.19(D)(1) does not expressly limit the ODH regulations to forensic laboratories, when read along with other portions of R.C. 4511.19 and the ODH regulations, such an intent may be inferred. The second paragraph of R.C. 4511.19(D)(1) specifies which individuals may withdraw blood when a person submits to a blood test at the request of a law enforcement officer under R.C. 4511.191. R.C. 4511.19(D)(3) provides that the person who was tested may have a physician, registered nurse, qualified technician or chemist of his or her choosing administer a chemical test "in addition to any administered at the request of a police officer." In addition, under the new R.C. 4511.19(E)(1), which was added under S.B. 123, "a laboratory report from a forensic laboratory certified by the department of health that contains an analysis of the whole blood, blood serum or plasma, breath, urine, or other bodily substance tested * * * shall be admitted as prima-facie evidence of the information and statements that the report contains." Ohio Admin. Code 3701-53-05(E) requires blood and urine containers to be labeled with the name of the suspect, which implies that the blood has been drawn for law enforcement purposes. Accordingly, R.C. 4511.19 and the regulations, read together, could suggest that only blood analyses performed at the request of law enforcement officers are required to comply with ODH regulations. This interpretation would comport with the legislature's actions in amending R.C. 2317.02(B)(1)(b) to provide that physician-patient privilege does not prevent the admission of alcohol and drug test results in any criminal prosecution. We note, however, that virtually all courts of appeals have addressed analyses by clinical laboratories in the context of whether the laboratory has substantially complied with ODH regulations, not whether the regulations apply at all.
 {¶ 54} Clearly, this issue is in need of legislative clarification. The unfortunate result of this apparent legislative oversight is that law enforcement may be unable to use the results of blood tests performed by certified clinical laboratories in many of those DUI cases where the defendant has done the greatest harm, i.e., aggravated vehicular homicide cases. Surely, this was not the goal of the legislature. As recognized in Quinones, by amending R.C. 2317.02(B)(1)(b), the Ohio legislature seemingly had expressed an intent to make clinical test results available in DUI prosecutions. R.C. 4511.19
and R.C. 3701.143, as currently drafted, do not clearly reflect this intent.
 {¶ 55} Wells' assignment of error is overruled.
 {¶ 56} The judgment of the trial court will be affirmed.
Brogan, J. and Young, J., concur.
[1] In my concurrence in Mayl, I agreed with the majority opinion that the results of a blood analysis that was non-ODH compliant should not be admissible where the aggravated vehicular homicide charge was based upon a per se violation of R.C.4511.19(A), i.e., R.C. 4511.19(A)(2) through (7). However, I expressed my view that a non-compliant blood analysis should not necessarily preclude the admission of the test result in a prosecution based on R.C. 4511.19(A)(1).
[2] We note that in a per se violation prosecution, tests results may be inadmissible for failure to comply with statutory and regulatory requirements even though they comport with due process.